Howard **GERSHMAN,** Esq., Assignee for Benefit of creditors of Vanguard Machinery, Inc.

v.

**INTERNATIONAL BUSINESS MACHINES CORPORATION.**

Civ. A. No. 82–2577.

United States District Court, E.D. Pennsylvania.

Oct. 18, 1985.

Melvin A. Bank, Philadelphia, Pa., for plaintiff.

K. Robert Conrad, Elizabeth K. Schuster, Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

During 1979 and 1980 Vanguard Machinery, Inc. manufactured more than 7,000 printhead assemblies pursuant to written purchase orders from IBM Corporation. IBM rejected thousands of the parts claiming that they were out of blueprint specification. With the expectation of receiving purchase orders for up to 50,000 printhead assemblies, Vanguard devoted additional man hours to reworking several thousand of the parts. When the anticipated purchase orders were not forthcoming, the substantial losses already incurred on the project led to Vanguard's insolvency and the appointment of plaintiff as the assignee for the benefit of Vanguard's creditors.

According to plaintiff the parts were rejected and needed to be reworked because IBM supplied Vanguard with gauges that were incapable of measuring accurately the precision tolerances called for by IBM's blueprints. Since IBM allegedly required Vanguard to use the faulty gauges, plaintiff claims that IBM is responsible for the parts needing to be reworked and must bear the costs incurred by Vanguard in reworking the parts to specification.

As well as denying liability, defendant has counterclaimed to recover (1) various tools defendant consigned to Vanguard which have not yet been returned; (2) parts paid for by defendant which are still in plaintiff's possession; and (3) costs incurred by defendant in reworking nonconforming parts.

Judgment was originally entered in this suit on March 29, 1984. On appeal by defendant, the court of appeals remanded the case with an order under which plaintiff was permitted to amend his complaint, defendant was permitted to amend its answer, and the parties were given the opportunity to present additional evidence. What follows constitute my findings of fact and conclusions of law based upon the amended pleadings, the evidence at the first trial and the evidence produced at the second trial.

Plaintiff is the assignee for the benefit of the creditors of Vanguard Machinery, Inc. Plaintiff is an individual and a citizen of the Commonwealth of Pennsylvania. Defendant is a New York corporation with its principal place of business in New York. The amount alleged to be in controversy is more than $10,000. I therefore have subject matter jurisdiction over this suit.

In 1979 and 1980 Vanguard received written purchase orders from IBM for approximately 7,500 printhead assemblies. As it does with other of its suppliers, IBM loaned Vanguard numerous tools to aid in the production of the parts it had on order. Among those tools were the gauges at issue in this lawsuit, which Vanguard used to measure whether the parts it was producing met IBM's demanding specifications.

Before IBM would consign any equipment to its suppliers, it required them to sign blank tooling certificates that specified the conditions under which IBM was

lending the equipment. In conspicuous type the tooling certificates purported to disclaim any warranties by IBM: "NO WARRANTIES OR REPRESENTATIONS ARE MADE BY IBM WITH RESPECT TO THE EQUIPMENT OR DOCUMENTATION, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."

One of these tooling certificates was signed by Vanguard before it contracted to produce any of the parts at issue in this suit, and was in effect when IBM submitted its first four purchase orders. A second tooling certificate was signed by Vanguard in October, 1979, and was in effect when IBM submitted the remaining purchase orders at issue in this suit. Since by their terms the tooling certificates covered all IBM owned tools and equipment in Vanguard's possession, they clearly applied to the gauges provided by IBM.

Over the two year course of production of the printhead assemblies, IBM furnished Vanguard with four different gauges to measure the parts being produced. Whenever IBM provided Vanguard with a gauge it kept a copy so that IBM could also check the printhead assemblies as they were received from Vanguard. The first set of gauges, referred to as P–B and P–G, had been previously used by Vanguard in the production of another part for IBM. Due to Vanguard's problems with the first set of gauges, they were replaced by IBM in early May, 1980, with a gauge referred to as P–D. In late May, 1980, Vanguard received another gauge from IBM referred to as the "super gauge."

Vanguard has made two somewhat contradictory complaints about the gauges. First, Vanguard claims that because of the design of the gauges it was physically impossible for them to measure the specifications about which IBM was concerned. Due to the equipment supplied by IBM, it was, therefore, impossible for Vanguard to know whether it was producing conforming parts. Vanguard also claims that the P–B

gauge maintained by Vanguard and the P–B gauge maintained by IBM did not correspond to one another, so that parts which conformed to specifications according to the Vanguard gauge would appear to be nonconforming when measured on IBM's gauge.[1]

IBM's own internal documents show that gauge P–G needed to be redesigned and that the P–B gauges needed to be recalibrated so that they would correspond to one another. I therefore find that the inability of gauges P–B and P–G to measure properly the assemblies caused Vanguard to produce nonconforming parts. Vanguard, however, has not sustained its burden of proving that the gauges delivered by IBM in May, 1980, had defects which caused Vanguard to produce nonconforming parts. I therefore find that beginning in early May, 1980, when Vanguard received gauge P–D, IBM's gauges did not cause Vanguard to produce nonconforming parts.

Simply because IBM supplied Vanguard with gauges P–B and P–G, which were in fact faulty gauges and which did in fact cause the production of nonconforming parts, however, does not establish IBM's liability for Vanguard's damages. At most, plaintiff has established that IBM agreed to supply Vanguard with certain tools, including gauges to measure whether conforming parts were being produced by Vanguard. There is insufficient evidence, however, to prove that IBM agreed to design and supply tools which would meet Vanguard's needs in fulfilling its contract with IBM. IBM was relying on Vanguard to decide which tools would be used to manufacture conforming parts and how those tools would be designed. If Vanguard was unhappy with the gauges first supplied by IBM, it did not have to use them. Instead, Vanguard could have told IBM what type of gauges it needed and showed IBM how to design them. IBM then either would have built the gauges for

---

1. These claims are contradictory because if it was physically impossible to measure any specifications with the gauges supplied by IBM, then it would be irrelevant whether Vanguard's copy of the gauge corresponded to IBM's.

Vanguard or paid for someone else to do so.

The fact that a buyer agrees to supply some of the tools and raw materials needed to produce an article it wants to purchase, does not necessarily mean that the buyer has agreed to decide what tools and raw materials should be used in production. In many instances one would expect a supplier who has the skill and expertise necessary to produce the desired article, to decide which tools or raw materials will be used, even if the buyer has agreed to furnish them. When a production run of thousands of duplicate parts requires the design and manufacture of unique tools, as was necessary in the production of printhead assemblies by Vanguard, one cannot assume that the risk of correctly designing and manufacturing the necessary tools has been shifted to the buyer simply because it has agreed to supply some of the seller's tools.

Plaintiff has failed to prove by a fair preponderance of the evidence that IBM agreed to assume the risk of designing and manufacturing the gauges needed by Vanguard to measure whether it was producing conforming parts. IBM did not give any express warranties by affirmation, promise or otherwise, concerning the gauges. In the tooling certificates signed by Vanguard, IBM clearly, conspicuously and specifically disclaimed all warranties, including the warranties of merchantability and fitness for a particular purpose, concerning the tools it was lending to Vanguard. Vanguard was on notice that it was responsible for making sure that the tools it was using were adequate to accomplish the task for which they were required.

Although not pled in his complaint, plaintiff now claims that IBM's disclaimer of warranties was unconscionable. Unconscionability is a doctrine under which courts may refuse to enforce unfair or oppressive contracts because of procedural abuses arising out of the contract formation process or substantive abuses relating to the terms of the contract. Unconscionability is often described as a lack of mean-

ingful choice coupled with a contract term which is so one-sided as to be oppressive. *See, e.g., Stanley A. Klopp, Inc. v. John Deere Co.,* 510 F.Supp. 807, 810 (E.D.Pa. 1981), *aff'd mem.,* 676 F.2d 688 (3d Cir. 1982). The principle, however, is meant to prevent oppression and unfair surprise and not to disturb the allocation of risks resulting from superior bargaining power. 13 Pa.C.S.A. § 2302 comment 1 (1984).

The burden of proving unconscionability is greater in a commercial setting where the parties are assumed to be capable of looking out for their interests and less likely to be taken by surprise. Principles developed to protect unwitting consumers cannot blindly be transferred to a purely commercial context and used to favor one commercial party over another. A number of courts have recognized that, although it is possible, it is rare that a commercial contract or term will be found to be unconscionable. *See, e.g.,* 510 F.Supp. at 810.

The circumstances surrounding the formation of this contract lend little support to plaintiff's claim of unconscionability. Vanguard can scarcely claim to have been surprised by the terms of the contract. The tooling certificates left no doubt that IBM disclaimed all warranties on equipment lent to Vanguard by IBM. Even though Vanguard's previous experience with gauges supplied by IBM had proven quite problematic, it still chose to accept a new contract from IBM without insisting that IBM explicitly assume responsibility for designing and building an appropriate gauge. Even as Vanguard was having problems using the gauge and producing conforming parts, it chose to sign a second tooling certificate without even attempting to place the burden of supplying a suitable gauge on IBM.

Nor can Vanguard claim that it was denied a meaningful choice in accepting or rejecting the contract terms offered by IBM. The tooling certificates explicitly invited amendments to their terms and conditions, but Vanguard chose to accept them as written. There is no evidence that Van-

guard attempted to alter the contract but was rebuffed by IBM.

Although with hindsight the terms of Vanguard's contract with IBM seem somewhat one-sided, both Vanguard and its president, Albert Epprecht, had sufficient experience in the industry to comprehend fully the terms of the bargain. The doctrine of unconscionability was not intended to relieve experienced merchants from misfortunes occasioned by their poor business judgments. Vanguard made a bad bargain, but I do not have the power to correct its mistake.

Plaintiff also relies upon the implied covenant of good faith and fair dealing which plaintiff claims should be viewed as part of every contract. In support of his position plaintiff cites a number of construction contract cases in which contractors were awarded damages due to the other parties' breach of their obligation not to impede or hinder the contractors in performance of their obligations. *See, e.g., North Shore Sewer & Water, Inc. v. Corbetta Const. Co.,* 395 F.2d 145 (7th Cir.1968); *Fairbanks Builders, Inc. v. Morton DeLima, Inc.,* 483 P.2d 194 (Alaska 1971).

The general duty not to hinder or delay, however, can be disclaimed by an exculpatory clause that prohibits claims for delay damages. *Kalisch-Jarcho, Inc. v. City of New York,* 58 N.Y.2d 377, 461 N.Y.S.2d 746, 448 N.E.2d 413 (N.Y.1983). Although public policy might prohibit an exculpatory clause from insulating a party from liability for intentional wrong doing or grossly negligent conduct, such a clause would "have little purpose if it were not read to extend acceptability to a range of unreasonable [conduct]." 461 N.Y.S.2d 749, 448 N.E.2d at 416.

Plaintiff has neither claimed nor proven that IBM's conduct with respect to the gauges constituted gross negligence or intentional wrong doing. I find, therefore, that to whatever extent IBM's conduct, vis-a-vis the gauges, delayed or hindered Vanguard in the performance of its contract, IBM cannot be held liable for that conduct due to its disclaimer of warranties concerning the gauges.

Judgment will therefore be entered against plaintiff and for IBM as to all of plaintiff's claims for damages arising out of IBM's consignment of gauges to Vanguard.

Plaintiff has made an additional claim for damages unrelated to the gauges. Plaintiff claims that while Vanguard was in the process of filling an IBM purchase order for 500 assemblies (purchase order No. A 173344 830 S), IBM made several engineering changes which forced Vanguard to scrap more than 500 parts it had already machined to conform to IBM's original specifications.

■ Regardless of how many parts Vanguard was forced to scrap, IBM's responsibility cannot extend beyond the 500 parts requested in the purchase order. If Vanguard chose to manufacture parts not yet on order, it cannot claim damages when its customer orders parts which do not correspond to those Vanguard, on its own, decided to produce. By producing parts before receiving an order, Vanguard assumed the risk that the orders it anticipated would not be forthcoming.

Epprecht testified that IBM's engineering changes forced Vanguard to scrap more than 500 parts. Documentary evidence submitted by plaintiff in support of his position, however, shows that Vanguard waited almost two years before requesting that IBM pay for the scrapped parts. IBM has presented testimony and documentary evidence that the parts delivered in accordance with the purchase order at issue were inspected to the specifications that existed before IBM made its engineering change. *See* Ex. T.D–13 and T.D–669. Since IBM was inspecting the parts according to the older engineering specifications, there was no reason for Vanguard to scrap parts made to satisfy those older specifications. I therefore find that plaintiff has not sustained its burden of proving that Vanguard scrapped 500 parts due to IBM's engineering change.

Plaintiff admits that Vanguard is obligated to return all tools and gauges that it received from IBM. Accordingly, I con-

clude that any such tools or gauges are the property of IBM and must be returned.

Similarly, plaintiff admits that it is holding an undetermined number of printhead assemblies which IBM returned for reworking and for which IBM has already paid. Accordingly, plaintiff must give IBM all such parts or return the money received for such parts.

Finally, IBM seeks recovery for the costs it incurred in reworking nonconforming assemblies it received from Vanguard. A party is entitled to recover the cost incurred to perform work which was the responsibility of another party to perform. *United States v. Klefstad Engineering Co.*, 324 F.Supp. 972, 976 (W.D.Pa.1971). I conclude that IBM is therefore entitled to receive all costs incurred to rework nonconforming parts delivered by Vanguard. The evidence submitted by IBM shows those costs to have been $5,026.74.