NATIONAL CONTROLS
CORPORATION

v.

NATIONAL SEMICONDUCTOR
CORPORATION, Appellant.

No. 86–3784.

United States Court of Appeals,
Third Circuit.

Argued Oct. 5, 1987.

Decided Nov. 23, 1987.

David A. Brownlee (argued), Kenneth M. Argentieri, Jeffrey T. Barbour, Kirkpatrick & Lockhart, Pittsburgh, Pa., for appellant.

T. Lawrence Palmer (argued), Wexford, Pa., for appellee.

Before BECKER, SCIRICA and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Defendant, National Semiconductor Corporation (NSC), appeals an adverse jury verdict in a breach of contract and warranties suit brought in diversity by National Controls Corporation (NCC) in the United States District Court for the Western District of Pennsylvania. NSC asserts that it was entitled to a judgment notwithstanding the verdict (judgment N.O.V.) because the jury's award of $1,400,000 in damages was based on its improper consideration of consequential damages and the trial court's erroneous instructions with respect to such damages. NSC also contends that the district court committed reversible error in several of its evidentiary rulings. We reverse.

## I.

NCC is a small Pennsylvania company involved in the design and production of control systems and electrical devices for

its various customers. It also was participating in the development and production of a new or "SNAP" type of telephone for MCI, a national telephone company exclusively engaged in providing long distance service. This "SNAP" telephone would allow consumers direct access to MCI's long distance telephone services by automatically dialing the MCI code numbers and would also reach the rotary market. The development of the project was to proceed in four phases and the project was subject to termination at any time for a variety of business reasons. The proposed new telephone was to use certain specific devices called COPS, microcontroller units which are a type of integrated circuit, essentially a computer on a chip, produced by NSC, a Delaware corporation based in California. NCC participated in the first, or "development," phase of MCI's project by supplying ten test telephones. The telephones contained COPS microcontroller units produced by NSC and sold to NCC in the summer of 1982. NCC raises no claim with respect to this phase and none of the damages awarded relate to it.

NCC also participated in the next, pretest, phase of the project. MCI ordered 200 test telephones from NCC in December of 1982 for a total price of $27,400. Purchase orders for additional quantities were to be authorized "only after the 200 sets are tested, approved and accepted." Dissatisfied with the small quantity of telephones ordered, NCC sought to gain MCI's commitment to an order for 60,000 telephone units. MCI was unwilling to place such a large order and, after further negotiations, MCI issued a final purchase order on February 7, 1983, for an aggregate of 450 test telephone units at a total price of $55,400. MCI's purchase order specifically limited its purchase commitment to the 450 telephones.[1]

NCC planned to use NSC's chips to produce the phones. Late in 1982, NCC entered into a contract with NSC, through NSC's agent CAM/RPC, in which it ordered a total of 1,200 microprocessor[2] units from NSC. NSC breached its contract and its warranties of merchantability and fitness for a particular purpose with respect to this order by delivering only a small number of defective microcontroller units. As a consequence, NCC supplied only 126 of the first 200 test telephone sets, and some of those failed because of the poor quality of the microprocessors supplied by NSC.

Notwithstanding the failure to make the required delivery for the 450 test telephones, MCI ordered 6,000 NSC COPS units from NCC in May of 1983 in anticipation of the third, or pilot test, phase of the SNAP phone project. The total purchase price of the order was $38,580. NCC in turn ordered 6,100 microcontroller units from the defendant for a purchase price of $35,014.[3] In addition, NCC sent MCI a price quotation for 5,000 telephones for this pilot test phase of the project, but MCI never issued a purchase order accepting that quotation.

NSC failed to deliver any of the 6,100 chips ordered by NCC and MCI eventually cancelled the purchase order for chips that it had placed with NCC. Some five months later, MCI terminated the SNAP phone project in its entirety.

After hearing evidence regarding NCC's relationship with MCI and its contracts with MCI and NSC, the jury found that NSC had breached its contract and its warranties of merchantability and fitness for a particular purpose and awarded $1,400,000 in damages to NCC. A large portion of this award can only represent the jury's acceptance of NCC's claims of "lost profits" on the potential sale of thousands of telephones to MCI. NSC's motions for a

---

1. MCI's purchase order stated: "It is recognized and agreed to by the parties that this purchase order represents MCI's total obligation to purchase Telesets from Seller."

2. Microprocessor units are interchangeably referred to by the parties and in this opinion as microcontroller units, microchips, "chips," and teleset chips.

3. Thus, NCC's potential profit on the sale of the 6,000 microchips amounted to $3,566.

directed verdict and for judgment N.O.V. were denied.

## II.

NSC challenges the denial of its motion for a directed verdict and for a judgment N.O.V. on several theories. It asserts that (1) the damages sought by NCC were not recoverable as a matter of law, (2) the evidence was too speculative to support a jury verdict, and (3) the jury's verdict was not supported by the evidence. Our review of the district court's denial of the judgment N.O.V. is determined by whether there is sufficient evidence in the record to sustain the verdict of the jury on the issue of consequential damages. *Acosta v. Honda Motor Co., Ltd.*, 717 F.2d 828, 839–40 (3d Cir.1983). The record must be viewed in the light most favorable to the non-moving party, and the denial of the motion should be affirmed unless the record is " 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.' " *Id.* at 840 (citation omitted).

It is undisputed that Pennsylvania law governs the jury's consideration of damages in this action. Pennsylvania has adopted the Uniform Commercial Code (UCC) and permits recovery of consequential damages resulting from breach of warranty or contract by a seller. 13 Penn. Cons. Stat.Ann. § 2714(c) (Purdon 1984). Such consequential damages may include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." 13 Pa. Cons. Stat.Ann. § 2715(b)(1) (Purdon 1984). Lost profits are recoverable as consequential damages in a proper case, such as where a seller knows or has reason to know that a buyer is purchasing a good for resale. *See, e.g., Kunststoffwerk Alfred Huber v. R.J. Dick*, 621 F.2d 560 (3d Cir. 1980). The award of such damages, however, pits the plaintiff's right to the bargain of his contract against the need to prevent jury verdicts based on speculation rather than proper proof. At issue in the present case is the application of section 2715 where the plaintiff attempted to show that the defendant's breaches of contract and warranty in sales aggregating 7,300 microcomputer chips were the proximate cause of lost profits on the sale of up to 180,000 telephones.

The defendant asserts that the consequential damages sought by NCC constitute losses of "good will" or mere speculative profits and, as such, are not recoverable under Pennsylvania law. NCC, however, argues that its consequential damages claim is predicated only on commitments for orders that the jury legitimately found were lost to NSC's breaches of contract and warranty.

Under Pennsylvania law, lost profits are recoverable when they are "lost on a particular sale or contract for the performance of which the goods in question were purchased." *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1226 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). In contrast, a breach of contract or warranty may lead to non-recoverable loss of good will where the defendant's breach causes customer dissatisfaction with the plaintiff which is then translated into a loss of expected profits. *Id.* at 1225 (citing *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968)). The bar to recovery of damages for loss of good will, including proof of such damages, is a matter of law in Pennsylvania, thus precluding the plaintiff from attempting to show that in his case the damages would not be speculative. Comment, *Loss of Goodwill and Business Reputation as Recoverable Elements of Damages Under Uniform Commercial Code § 2–715—The Pennsylvania Experience*, 75 Dickinson L.Rev. 63, 78 (1970).

Even where the plaintiff's claim truly represents a claim for lost profits, rather than loss of good will, it may be rejected as speculative and unrecoverable. This is particularly true where the claim of lost profits is made in the context of a new and untried business venture. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.

Super. 90, 117–26, 464 A.2d 1243, 1257–61 (1983) (burden of proof is high with respect to new business profits).

■ No matter how the lost profits claim is characterized, however, an underlying prerequisite to the recovery of damages is proof of proximate cause. *Id.*, 318 Pa.Super. at 120, 464 A.2d at 1258. Therefore, we need not explore the intricacies of Pennsylvania law to determine whether recovery for lost profits or lost good will is at issue. Instead, we will directly address NCC's contention that its consequential damage claim was based on commitments for orders to determine whether the plaintiff's proof provided a basis upon which the jury could have found that NSC's breach proximately caused the loss of profits on MCI's non-contractual and contractual commitments.

### III.

■ To sustain a damages award, NCC must have provided sufficient evidence from which the jury could have found that its lost profits were proximately caused by the defendant's breach.[4] *See Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa. Super. at 120, 464 A.2d at 1258. The damages sought must be " 'a proximate consequence of the breach, not merely remote or possible.' " *Dairymen's Cooperative Sales Ass'n v. McCreary*, 132 Pa.Super. 524, 528, 1 A.2d 508, 510 (1938) (citation omitted). The element of causation defines the range of socially and economically desirable recovery and requires not only " 'but-for' causation in fact" but also "that the conduct be a 'substantial factor' in bringing about the harm." *Klages v. General Ordnance Equip. Co.*, 240 Pa.Super. 356, 373, 367 A.2d 304, 313 (1976). Where the losses cannot be allocated between those caused by the defendant's breach and those not, an entire claim may be rejected. *Lichter v. Mellon-Stuart Co.*, 305 F.2d 216, 220 (3d Cir.1962). NCC thus had to prove that any lost profits were proximately caused by

NSC's breach, and not through some other cause. In essence, the proximate causation requirement demands that the plaintiff prove that the defendant's breach was a substantial factor in causing some harm. Two types of proof will thus be relevant: evidence of MCI's commitments to NCC and evidence of a causal relationship between the defendant's breaches and the alleged repudiation.

NCC claims damages based on profits lost on (1) the contract for the sale of 450 telephones, (2) the contract for the sale of 6,000 microchips, (3) the "commitment" for the sale of 5,000 telephones, and (4) the "commitment" for the sale of at least 60,-000 telephones. It also claims damages based on its engineering and lease expenditures. Each of the bases for recovery will be examined in turn.

### A. The Order for 450 Telephones

■ The evidence clearly showed that NCC had a purchase order for 450 telephones from MCI. Further, the evidence was sufficient to show that NSC breached its contract to produce the microchips that NCC had planned to use to build the 450 phones. As a result, only 126 phones were delivered, and some of those were defective.

The plaintiff thus presented sufficient evidence from which the jury could have readily found that NSC's breaches were the proximate cause of some damage to NCC. Unfortunately, the plaintiff does not point to any evidence, and we have not been able to independently find any, to show that it lost money on this order or that it was not paid by MCI for its purchase order of February 7, 1983. The claim for lost profits on this contract must therefore be rejected.

### B. The Loss of Profits on 6,000 Microchips

■ A similar fate befalls the plaintiff's claim for lost profits on the resale of 6,000 microchips to MCI. NCC provided evi-

---

**4.** NCC's contention that this issue was not preserved for review is without merit. NSC argued in the district court and on appeal that the evidence was not sufficient to support the jury's

award of damages. As part of this argument, NSC has continuously contended that its breaches did not lead to the lost profits claimed.

dence to show that MCI had ordered the microcontroller units from it, and that it had in turn ordered the chips from NSC for a potential profit of $3,566 on the entire transaction. The plaintiff also presented uncontroverted evidence that NSC failed to deliver any of the ordered chips and that MCI eventually cancelled its purchase order. However, the record indicates that MCI had paid the purchase price to NCC, and the plaintiffs failed to present any evidence to the contrary or evidence that MCI has sought or obtained reimbursement. Thus, absent proof that NCC was legally liable to MCI for a specific amount or that it had lost expected profits on the contract, the claim with respect to the 6,000 microcontroller chips must fail. *See, e.g., Neville,* 422 F.2d 1205, 1222–23 (breaching party not liable for payments made to others by injured party unless that party was legally liable for the payments).

### C. The Loss of Profits on 5,000 Telephones

 NCC claimed that the order for 6,000 chips also included a commitment from MCI for the purchase of 5,000 telephones on which NCC had quoted a price of $70.37 for an aggregate purchase price of $351,850. At a 10% net profit, counsel contended that NCC would have earned $35,185 on this item. Because NSC failed to deliver any of the necessary chips for this "commitment," proximate causation will not be an issue. Our analysis must instead focus on the nature of "the commitment" to determine whether NCC in fact sustained any losses.

As to the alleged loss of profits for the 5,000 teleset telephones it expected to produce on the basis of the purchase order from MCI for 6,000 microcomputer chips, NCC is correct in stating that it sent MCI a price quotation for 5,000 telephones expected to be used in connection with the pilot test phase of the project. However, there is no evidence that MCI ever accepted the

quotation: Browne, NCC's president, unequivocally conceded in his testimony that MCI never issued a purchase order in response to the quotation, although he claimed that NCC started production even without the purchase order. On the other hand, Thomas, Director of Customer Service for MCI, testified that the purpose of ordering the 6,000 "teleset chips" from NCC was not to have NCC manufacture the telephones. MCI ordered the chips so that it could "give them to a quantity manufacturing company to produce 6,000 marketable telephones so that we could get on with the next phase of the roll out of the product." He stated that the quantity manufacturing company referred to was a company other than NCC. Therefore, the claim for this item must also be rejected.

### D. The Loss of Profits on up to 180,000 Telephones

 NCC asserts that "there was substantial evidence of a firm commitment for an immediate requirement of 60,000 telephone units and subsequently for at least 20,000 units per month." It further avers that there was similar evidence of "an oral and written acknowledgement by MCI of its contract with [NCC] ... to produce the first generation teleset."[5] NCC argues that it had been chosen to produce the first generation phones, and predicates its damage claims presumably on the loss of profits and on the expenses incurred in connection with the production of these phones. The telephones expected to be produced in the first two phases of the telephone project are referred to by the plaintiff as the "first generation teleset." It vigorously argues that the price for such units had been established at $63.87 for the first 60,000 and $59.85 for the next 60,000 units and beyond.

On March 28, 1983, MCI had requested that the plaintiff obtain mass production scheduling from NSC for high volume pro-

---

**5.** There is no evidence that MCI had a "first generation" project separate and independent of the four-phase project referred to in its internal memorandum of July 27, 1983, and otherwise described in MCI documents. Although its Re-

quest for Proposal of April 15, 1982, does refer to its current contract "with one firm to provide the first generation of the MCI telesets," this obviously refers to the 450 telesets.

duction quantities of the microprocessor, and MCI had internally projected the sale of a minimum of 800,000 telephones for the first year. NSC's microprocessor failed both merchantability standards and its use for the particular purposes, the plaintiff asserts, and NSC also breached its contract with respect to the original order. It delivered only 126 microprocessors, some of which were flawed. NCC never was able, the plaintiff argues, to deliver any portion of the balance of the 60,000 units scheduled because of defendant's repeated breaches. Thus, plaintiff contends, "The first generation teleset project was cancelled."

The problem with the plaintiff's argument, however, is that the record fails to sustain it. An award of lost profits required speculation by the jury on the likelihood that, absent NSC's breaches, MCI would have proceeded with the project and on the likelihood that MCI would have chosen NCC as a supplier of some portion of the telephones produced.[6] The plaintiff failed to present evidence sufficient to transform the jury's speculation on these two probabilities into the reasoned assessment necessary to support a damage award.

The first flaw in NCC's argument concerns the absence of evidence to suggest that MCI would have chosen NCC as a supplier of some of the telephones produced. There never was any commitment by MCI for the 60,000 units. MCI described its SNAP phone project in its internal memorandum of July 27, 1983, as consisting of four phases commencing with the development phase and ending with the roll out phase. The memorandum stated that "[p]resently the SNAP Phone Program is in the Pre-Test Phase, gearing up for the Pilot Test of 5000 units." There was no evidence of a contract between MCI and NCC for anything other than the sale of the 450 telephones and 6,000 microcontroller units. The purchase order for the 450 telephones specifically stated that MCI was not obligated to purchase any additional units. Similarly, MCI representatives testified that the 6,000 microchip order did not include the purchase of any additional telephones. The evidence suggested, at most, that MCI might also have orally expressed an interest in continuing to order either more COPS units or more telephones if it went forward with its SNAP phone project.

The total of the evidence supporting any further agreement between MCI and NCC consists of inquiries by MCI regarding NCC's production capacity and the statement by MCI in a Request For Proposal (RFP) to suppliers for production of computerized single line telesets that MCI already had contracted for the production of a first generation telephone.[7] The statements in the RFP do not contradict the written terms of MCI's purchase orders limiting its purchases to 450 telephones.

Nor do MCI's inquiries as to NCC's ability to produce large quantities of telephones indicate that NCC had been given a contract for such production. There is no evidence to show that there were any other contracts or that MCI cancelled any other commitments because of NSC's breaches. In its initial pleadings and its arguments in the district court, NCC recognized that it had no contract for the production of the thousands of telephones for which it claimed lost profits. NCC's belated argument in this court that its contract with MCI included commitments for later orders of such phones is without support in the record.

▓▓▓ Even if such commitments were made and provide a sufficient basis upon

---

**6.** Judge Becker would rely solely on the first ground, i.e., NCC's inability to prove that MCI's cancellation of the project was caused by NSC's default, as he believes there was sufficient evidence for the jury to find that MCI would have chosen NCC as a supplier of some portion of the phones, had MCI continued with the project.

**7.** NCC relies upon a statement in MCI's RFP for the second generation of telephones:

> You are advised that MCI currently has under contract one firm to provide the first generation of the MCI Teleset. The requirement to be satisfied by the Request for Proposal does, however, represent an additional requirement with different specifications from the current product.

which to award lost profits, *compare Neville*, 422 F.2d at 1225 (good will), and *Delahanty*, 318 Pa.Super. at 117–26, 464 A.2d at 1257–61 (new business profits), the plaintiff still failed to show that the commitments were lost because of NSC's breaches. The defendants contend that the uncontroverted evidence establishes that MCI decided not to go forward with the SNAP phone project because of its own business dictates, and that this decision is reflected in its failure to go forward with the project with any supplier, not just with NCC.

Long before any breach by NSC, MCI showed its disinclination to order large numbers of telephones from NCC by refusing NCC's importuning to order 60,000 telephones instead of 450. After NSC's first breach in the spring of 1983, MCI continued to proceed with the telephone project: it ordered microcontroller units from NCC and issued an RFP to fifteen companies, including NCC, who might be interested in producing third phase telephones. The evidence thus shows that MCI had doubts about NCC's ability to produce large quantities of telephones long before NSC's second breach of contract in the summer of 1983. *Compare Argo Welded Products v. J.T. Ryerson Steel & Sons*, 528 F.Supp. 583, 589 (E.D.Pa.1981) (potential causation problems noted where loss of sales might have been caused by factors other than defendant's breach).

Finally, NCC did not present evidence to show that MCI aborted the SNAP telephone project based on NSC's breaches. MCI continued to explore the third phase of the project with other vendors, finally terminating the program more than five months later without any stated reason or explanation. There was no evidence in the record regarding the reason for the cancellation of the project. The barren state of the record forces NCC to rely for its causation element solely upon the testimony given regarding the reason for the cancellation of the order for 6,000 microchips. From this evidence the jury was forced to speculate that NSC's breach led to the termination of the entire project. NCC thus gained a large jury damage award for telephone orders without a minimum of proof to show that NSC's earlier breach was the proximate cause of NCC's loss of profits, even if one presumes a "firm commitment" by MCI to NCC for future telephone purchases.

### E. Loss of Engineering and Lease Expenses

 NCC presented some evidence to the jury regarding engineering expenses of $197,000 sustained in the design of the SNAP telephone and lease expenses of $30,000 incurred because new space was rented in anticipation of increased production. With respect to the engineering and lease claims, NSC argues in its brief that these alleged expenses "were to be offset by potential revenues received from MCI in calculating NCC's alleged lost profits. By seeking both lost profits and expenses on a potential contract, NCC seeks an impermissible recovery." We agree.

The engineering and lease expenses sustained by NCC constitute damages based on its reliance interest. Recovery for reliance damages is an alternative to recovery for lost profits, not a measure of additional damages. *Restatement (Second) Contracts* §§ 347, 349 [hereinafter *Restatement*]; *see also* P.A. Samuelson, *Economics* (10th ed. 1976) (price often includes both profit and recovery of fixed and variable expenses). NCC is entitled to receive either reimbursement for its expenses or its net profits but not both.

 The plaintiff may choose to recover expenditures made in reliance on a contract or commitment when there is insufficient proof of lost profits. *Restatement* at § 349. This rule presupposes, however, that the plaintiff presented proof that its expenditures were made reasonably. Here, NCC assumed the risk that it would never recoup its engineering and lease expenses if it did not receive future orders from MCI. *See Gershman v. International Business Machines Corporation*, 619 F.Supp. 1530, 1534 (E.D.Pa.1985). In *Gersham*, the plaintiff claimed damages from

IBM for parts it had already produced in reliance on IBM's specifications, later changed. The court found that IBM was not liable for any losses:

> Regardless of how many parts Vanguard was forced to scrap, IBM's responsibility cannot extend beyond the 500 parts requested in the purchase order. If Vanguard chose to manufacture parts not yet on order, it cannot claim damages when its customer orders parts which do not correspond to those Vanguard, on its own, decided to produce. By producing parts before receiving an order, Vanguard assumed the risk that the orders it anticipated would not be forthcoming.

*Id.* at 1534. Here it seems equally clear that NSC cannot be held liable for expenses undertaken by NCC without a purchase order. NCC presented no proof to suggest that, but for NSC's breaches, NCC would have obtained orders that would have allowed it to recoup these expenses. In fact, the evidence shows that MCI decided to terminate the project for its own reasons.[8] The plaintiff's claim for its fixed expenses must also be rejected.

### IV.

In summary, the trial court should have entered judgment N.O.V. in favor of National Semiconductor Corporation because of the plaintiff's failure to prove that NSC's breaches were the proximate cause of its alleged loss of profits and because of the lack of evidence to sustain its claims for losses on existing contracts or expenses allegedly incurred in connection with potential contracts.[9]

Accordingly, the judgment of the district court will be reversed and the case remanded with directions to enter judgment N.O.V. in favor of the defendant, National Semiconductor Corporation. Costs taxed against the appellees.

---

**8.** Some portion of the engineering expenses could be related to the contracts for the 450 telephones and 6,000 microchips. However, NCC has provided no basis upon which to allocate its expenditures, and indeed, no evidence to support the expenditures other than the testimony of its president. Where a damage claim cannot be allocated between amounts caused by a defendant's breach and those not, the entire claim may be rejected. *Lichter v. Mellon-Stuart Co.,* 305 F.2d 216, 220 (3d Cir.1962).

**9.** In light of our disposition of this appeal, there is no need to reach NSC's contentions that the district court erred in its evidentiary rulings and in its instructions to the jury.