IN RE: LATEX GLOVES PRODUCTS
LIABILITY LITIGATION MDL
1148

Eileen M. Hughes

v.

Allegiance Healthcare Corporation,
et al.

No. CIV. A. 97–1694.
No. MDL 1148.

United States District Court,
E.D. Pennsylvania.

April 12, 2001.

See also 134 F.Supp.2d 415.

Steven J. Cooperstein, Brookman, Rosenberg, Brown & Sandler, Philadelphia, PA, for plaintiff.

James A. Willhite, Jr., Montgomery, Mc Cracken, Walker & Rhoads, Philadelphia, PA, Christopher M. Santomassimo, Lowenstein & Sandler, PC, Roseland, NJ, for Baxter Healthcare Corp., Allegiance Healthcare Corp., defendants.

Samuel W. Silver, Margaret S. Woodruff, Schnader, Harrison, Segal & Lewis, Philadelphia, PA, for Becton, Dickinson and Company, defendant.

James M. Sweet, Nancy L. Harris, Drinker Biddle & Reath LLP, Philadelphia, PA, for Johnson and Johnson Medical, Inc.

## MEMORANDUM

LUDWIG, District Judge.

This is a products liability action that was selected for trial in this district as part of *In Re: Latex Gloves Products Liability Litigation*, MDL 1148. Defendants Allegiance Healthcare Corporation/Baxter Healthcare Corporation, Johnson & Johnson Medical, a division of Ethicon, Inc., and Becton, Dickinson and Company move for summary judgment. Fed.R.Civ.P. 56.[1] Jurisdiction is diversity, 28 U.S.C. § 1332, and Pennsylvania law governs substantive issues. The motion will be granted in part and denied in part.

On February 13, 1997, plaintiff Eileen M. Hughes filed this suit against defendant manufacturers for negligence; strict liability; breach of express and implied warranties; and fraudulent concealment for her allergenic injuries alleged to have been caused by exposure to defendants' latex products.[2] According to defendants, her tort-based claims cannot overcome Pennsylvania's two-year statute of limitations. As to the breach of warranty claims, these are objected to because of: (1) lack of causation, and (2) assumption of the risk. Defendants contend that the delivery of the gloves to plaintiff's employer predates February 13, 1993, which is the

---

1. Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. The movant must show that there is no triable issue of fact. The non-movant having the burden of proof at trial must point to affirmative evidence in the record—and not simply rely on allegations or denials in the pleadings—in order to defeat a properly supported motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Foehl v. U.S.*, 238 F.3d 474, 477 (3d Cir.2001).

2. Both parties discuss the distinction between type-I and type-IV allergenicity. Type–I allergy, caused by proteins in natural rubber latex, is immediate and systemic. Type–I reactions are immunologic, causing symptoms such as conjunctivitis, rhinitis, urticaria, respiratory distress, and anaphylaxis. Charpin dep. at 88. Anaphylaxis is a severe reaction, and may be terminal. Type–IV allergy appears to result from additive chemicals, and not from natural rubber latex, and manifests itself within 24 to 48 hours after exposure. Pltf. mem. at 2–5; defs. mem. at 5 n. 4; Charpin dep. at 202–04. Reaction is usually limited to the point of contact, and symptoms include pruritus, erythema and blisters. Pltf. mem. at 5; Charpin dep. at 203–04.

operative date for the four-year breach of warranty limitations period, and that, although plaintiff knew of her allergenicity before that time, she continued using the gloves thereafter.

## I. *Background*

Between 1988 and 1995, first as a student and then a registered nurse at Hahnemann University Hospital in Philadelphia, Pa., plaintiff used and was exposed to latex products.[3] Am. cmplt. ¶¶ 10–12; 8/20/97 Hughes dep. at 16–22. On January 14, 1991, her physician, Alan Levin, M.D., treated her for rashes on her hands and diagnosed the condition to be eczema. Levin–3, pltf. exh. F. She continued to wear latex gloves, and her condition worsened.[4]

On July 28, 1992, plaintiff was treated by Morton Perlman, M.D., at Hahnemann's Occupational Health Services, because her "hands [had] broke[n] out from latex gloves."[5] 1/13/00 Hughes dep. at 113–114; defs. exh. G. Perlman referred plaintiff to Eric Vonderheid, M.D., a member of Hahnemann's dermatology group, and noted in a consultation request form: "Has underlying chronic disease. Apparent exacerbation in glove area [with] urticaria on face." Consultation request form, defs. exh. H. Perlman prescribed Benadryl, and requested follow-up for the "question [of] latex gloves." *Id.*

On July 29, 1992, Vonderheid examined plaintiff.[6] 1/13/00 Hughes dep. at 127. Notes taken from the testing:

> [She had] hand eruption(s) since beginning work as nurse at HUH with exposure to latex gloves. Yesterday [she] wore gloves @ 1 hr ... severe eczema on hands and face....

Defs. exh. H. The notes also state Vonderheid's diagnosis of plaintiff was "probable latex allergy;" he advised her to order hypoallergenic latex gloves and to wear vinyl gloves until they arrived and explained to her the "rare possibility of anaphylaxis."[7] *Id.*; Vonderheid dep. at 51–

---

3. In the fall of 1988, plaintiff became a nursing student at Hahnemann. Between January and June 1990, while a student, plaintiff worked at Rolling Hill Hospital and thereafter was employed as a registered nurse at Hahnemann.

4. According to Levin's records, on April 10, 1991, plaintiff's rash had spread to her legs. Levin–4, pltf. exh. F.

5. Plaintiff testified:

 Q: What led you to go to Occupational Health?
 A: My hands had gotten swollen and they were really, really itching and bothering me.
 Q: And, is it fair to say that in your mind this reaction that you were now having was a little bit different from what you had shown Dr. Levin when you had seen him previously?
 A: Yes.
 Q: And, it was different in that now your hands were swollen, correct?
 A: Yes.

 Q: And, you may have had hives on your face?
 A: Yes.
 1/13/00 Hughes dep. at 113–14.

6. A dermatology resident, Ronald Jurzck, was present. Vonderheid dep. at 41.

7. Dr. Vonderheid's testimony:

 Q: Did you agree with the diagnosis of probable latex glove allergy?
 A: Yes.
 Q: And, the phase latex glove allergy here refers to a Type I reaction?
 A: Yes.
 Q: And, the diagnosis of probable latex allergy meant in your mind that this patient was actually allergic to latex gloves; is that fair?
 A: Yes. Although, without specific testing, there's other possibilities.

 \* \* \* \* \* \*

 Q: Is it fair to say that you and Dr. Jurzck told Ms. Hughes that your diagnosis was probable latex allergy?

53. In her deposition testimony, plaintiff said she remembered little from Vonderheid's examination; however, she maintained, he did not inform her that she had a systemic allergy.[8] 1/13/00 Hughes dep. at 125, 135.

On April 9, 1993, plaintiff again visited Levin, and his notes recite: "allergic—surgical latex.". Defs. exh. J. However, neither plaintiff nor Levin recalled the consultation, and, in reflecting on his notes from a visit in 1994, Levin explained, somewhat curiously, "if she had a systemic problem, she wouldn't have—we didn't make the connection to the gloves." [9] Levin dep. at 33–34. On June 14, 1993, a registration form for dental work at Hahnemann University Dental Health Center, signed by plaintiff, reads: "allergic to latex." Defs. exh. K. Plaintiff testified, however, that she would have told the dentist of her problems with "white gloves," and not a latex allergy. 4/5/00

A: Yes.
Q: And, is it also fair to say that you and Dr. Jurzck told Ms. Hughes that that meant that she was allergic to latex gloves?
A: Yes.
Q: And, did you and Dr. Jurzck also tell her that that meant she had a sensitivity to latex?
A: Yes.
Vonderheid dep. at 51–53.

Plaintiff challenges Vonderheid's expertise: he was a dermatologist and not an allergist; he had never treated other patients for latex allergy; he stated that it was possible to have a non-systemic type-I reaction; and "[n]o physician with an understanding of type I latex allergy would ever [have] permitt[ed] a patient with type I latex allergy to continue wearing latex gloves, hypoallergenic or otherwise." Pltf. mem. at 10. However, Vonderheid testified that during his medical career, he taught residents how to distinguish between type-I and type-IV allergenicity, and his description of symptomology was consistent with that of plaintiff's expert. Vonderheid dep. at 15–19, 67; Charpin dep. at 88, 204.

8. Plaintiff's deposition:

Hughes dep. at 232. On April 7, 1994, plaintiff gave birth to her daughter at Nazareth Hospital. A delivery record states that she had latex sensitivity. Def. exh. P. Two Nazareth outpatient records dated April 5 and 6, 1994, each signed by plaintiff, note that she was possibly allergic to latex. Def. exh. L, N. Nevertheless, plaintiff denies having informed the healthcare providers of a latex allergy. 4/5/00 Hughes dep. at 232–37.

In the summer of 1994, following her return from maternity leave, plaintiff stopped wearing latex surgical gloves. 1/13/00 Hughes dep. at 159, 161–62. On December 6, 1994, she was treated by David Pudles, D.O., for injuries she sustained in an automobile accident. Pudles dep. at 33. The notes of Pudles' associate, Joan Grzybowski, D.O., disclose that plaintiff was allergic to latex gloves.[10] Def.

Q: Did [Dr. Vonderheid] discuss with you the possibility that your use of latex gloves could lead to an anaphylactic reaction?
A: Not that I remember.
Q: So, you don't recall him discussing anaphylaxis with you at all?
A: No.

 * * * * * *

Q: Did [he] tell you you had a chronic disease?
A: Not that I remember.
Q: Did he tell you that you had a systemic allergy?
A: No.
Q: Okay. Just so I'm clear, you recall that he told you [that] you had eczema?
A: Yes.
1/13/00 Hughes dep. at 125.

9. Levin refers to eczema in his notes of April 10, 1991, February 7 and August 3, 1994. Pltf. exh. F.

10. Plaintiff admits telling Pudles of her latex allergy:
Q: And, during the first visit, did Dr. Pudles ask you if you had any allergies?
A: Yes.

supp. exh. E. On May 4, 1995, plaintiff had an anaphylactic reaction and went to Hahnemann's emergency room. She informed the attending physician of her problems with latex, including itchy hands she had experienced for the past two years. 1/13/00 Hughes dep. at 180–82; 4/5/00 Hughes dep. at 275–76; defs. exh. S. On May 11, 1995, she was treated by Jonathan Jaffe, M.D., an allergist, who subsequently diagnosed a type-I allergy. Pltf. ex. A.

On February 13, 1997, the complaint was filed. It alleges that as a result of being exposed to defendants' latex-containing products, with or without dust and powder, plaintiff sustained "severe and immediate reactions[,] ... including but not limited to the following: rhinitis, respiratory problems, tightness in the chest, swelling, dizziness, anaphylaxis, skin rashes, hives, contact dermatitis, extreme discomfort, depression and emotional distress[.]" Am. cmplt. ¶¶ 14, 15.

## II. *Discussion*

A. Pennsylvania's statute of limitations for tort claims

 Plaintiff's tort-based [11] claims are subject to Pennsylvania's two-year statute of limitations, 42 Pa.C.S.A. § 5524. Ordinarily, the limitations period "begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge,

mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 503 Pa. 80, 84, 468 A.2d 468, 471 (1983). However, an exception known as the discovery rule "arises from the inability of the injured, despite the exercise of due diligence, to know of the injury or its cause." *Id.* at 85, 468 A.2d at 471. "[W]here the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible." *Hayward v. Medical Center of Beaver County*, 530 Pa. 320, 325, 608 A.2d 1040, 1043 (1992) (citation omitted). "Conversely, if the existence of the injury and cause thereof are reasonably ascertainable within the two-year statutory period, the discovery rule does not apply and no tolling occurs." *Baumgart v. Keene Building Products Corp.*, 542 Pa. 194, 199, 666 A.2d 238, 240 (1995). In a "creeping disease" case, such as this one, the discovery rule tolls the running of the limitations period until a plaintiff knows or reasonably should know: (1) that he or she has been injured; and (2) that the injury was caused by another's conduct. *Crouse v. Cyclops Indus.*, 560 Pa. 394, 404, 745 A.2d 606, 611 (2000) (citation omitted); *see Whitson v. Safeskin Corp.*, 134 F.Supp.2d 415, 418–20 (E.D.Pa.2001).

---

Q: And, what did you tell him?
A: I told him I was allergic to gloves.
Q: Did you tell him you were allergic to latex?
A: I told him I was allergic to latex gloves.
Q: So, as of the time you saw Dr. Pudles in November of 1994, you understood that you were allergic to latex.
A: I thought that I probably was allergic to latex.
1/13/00 Hughes dep. at 160.

**11.** It is undisputed that plaintiff's negligence (count I) and strict liability (count II) claims

are subject to the two-year statute of limitations, 42 Pa.C.S.A. § 5524(2). The same limitations period also applies to her fraudulent concealment (count IV) claim, 42 Pa.C.S.A. § 5524(7). *See Bohus v. Beloff*, 950 F.2d 919, 926 (3d Cir.1991) ("[T]he inquiry under the fraudulent concealment doctrine is the same as that under the discovery rule."). Defendants' motion to dismiss plaintiff's claims for emotional distress and punitive damages is granted as to the tort-based claims, and, as to the breach of warranty claims, will not be ruled on at this time.

■ Here, according to plaintiff, she sustained two distinct, unrelated injuries from exposure to defendants' products—a dermatological problem (caused by additive chemicals) and a systemic condition (caused by natural rubber latex). She concedes having known of her dermatological injury before the two-year tort limitations cutoff of February 13, 1995, but denies having been aware of her type-I allergic injury until May, 1995. She also asserts that the symptomology presented by her type-IV allergy masked and concealed the more serious, albeit similar, complaints resulting from a type-I allergy. Defendants counter that the limitations period began running on July 28, 1992, when plaintiff had a systemic allergic reaction; and, therefore, all of her tort claims are time-barred. Def. mem. at 7.

As an initial matter, a ruling on plaintiff's contention—that separate limitations dates should be applied to type-I and -IV allergenicity—is unnecessary to this decision.[12] It is undisputed that the injuries alleged in the complaint are consistent with type-I reactions,[13] i.e., systemic allergenicity. The issue, therefore, is whether by February 13, 1995, the two-year tort limitations deadline, plaintiff knew, or, through the exercise of diligence, should have known, of her systemic condition.

The facts are clear that plaintiff should have known. On July 28, 1992, she complained to Occupational Health Services of swelling and rashes on her hands and face, which she associated with the use of latex gloves. She met with a dermatologist, Dr. Vonderheid, the following day. Although her recollection of the visit is vague, she explicitly does not challenge the accuracy of Vonderheid's notes—i.e., that her problems occurred after wearing gloves for approximately one hour; she was diagnosed with probable latex allergy; and the possibility of anaphylaxis was explained to her. For a registered nurse to have received

---

**12.** Plaintiff analogizes dermatological (type-IV) and systemic (type-I) conditions to the differences between pleural thickening and lung cancer in the context of asbestos litigation. *Marinari v. Asbestos Corp.*, 417 Pa.Super. 440, 612 A.2d 1021 (1992), held that separate claims would be actionable because:

> The damage to the human body which may result from asbestos exposure does not occur as a seamless progression of a single pathology. Instead, exposure to asbestos may result in a variety of benign and malignant conditions, each of which may occur at widely divergent times.

*Id.* at 447, 612 A.2d at 1024. Under *Marinari*, a plaintiff could commence suit upon discovery of each separate disease, if done so in a timely manner. *Marinari*'s "two-disease rule" was subsequently mooted by *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232, 237 (1996), in which asbestos-related, "asymptomatic" and "sub-clinical" pleural thickening were held not to be a compensable injury and, therefore, could not be the basis for a viable cause of action.

**13.** In *Clark v. Baxter Healthcare Corp.*, 83 Cal.App.4th 1048, 100 Cal.Rptr.2d 223 (2000), plaintiff claimed to have sustained two injuries from exposure to latex gloves, requiring application of two limitations periods. *Clark* determined that whether separate injuries occurred at different times was immaterial because the injuries alleged in the complaint encompassed both types of reactions. The decision looked to the general California rule, "that the cause of action is complete on the sustaining of actual and appreciable harm, on which the recoverable damages would be more than nominal." *Id.* at 1057, 100 Cal.Rptr.2d at 228 (quotation and citation omitted). Similarly, in Pennsylvania, "an injury is done when the act heralding a possible tort inflicts a damage which is physically objective and ascertainable." *Ayers v. Morgan*, 397 Pa. 282, 290, 154 A.2d 788, 792 (1959); *see also Orozco v. Children's Hosp. of Phila.*, 638 F.Supp. 280, 282 (E.D.Pa.1986) ("once the statute of limitations begins to run on an injury claim it also runs with respect to related injuries arising from the same negligent conduct, even if the related injuries are not immediately ascertainable").

that information from a physician[14] could well be enough to have activated the limitations period, without more.[15] *See Ackler v. Raymark Indus., Inc.*, 380 Pa.Super. 183, 194, 551 A.2d 291, 296 (1988) (citation omitted) ("Once a plaintiff knows, or should of known that he [or she] has suffered an injury, the statute of limitations then gives him [or her] the opportunity to select and consult with a lawyer, conduct the necessary investigation and commence suit. Two years is ample time in which to commence suit in a creeping disease case after the plaintiff acquires the requisite knowledge."). But in any event, the dermatologist's examination and preliminary diagnosis triggered her duty of inquiry; waiting for almost three years to consult an allergist was an unreasonable lack of follow-up as a matter of law. *See Ingenito v. AC & S, Inc.*, 430 Pa.Super. 129, 134, 633 A.2d 1172, 1175 (1993) ("diligent investigation may require one to seek further medical examinations as well as competent legal representation").

In another type of creeping disease case, *Trieschock v. Owens Corning Fiberglas Co.*, 354 Pa.Super. 263, 511 A.2d 863 (1986), plaintiff was told in March, 1982 by a company doctor that he might have asbestosis. Plaintiff had been asymptomatic prior to this preliminary diagnosis. On April 8, 1982, the diagnosis was confirmed by an independent pulmonary specialist.

Plaintiff filed suit on April 6, 1984. In applying the discovery rule, the decision stated:

> While the tentative diagnosis of suspected asbestosis was not sufficient to start the running of the statute of limitations, we believe it should be considered to have activated a duty on [plaintiff's] part to determine, with due diligence, whether he did, in fact, have that disease. The absence of such a duty would mean that a potential plaintiff with a tentative diagnosis could wait indefinitely before acting to confirm it. That would not be consonant with the purposes served by the statute of limitations.

*Id.* at 268, 511 A.2d at 866. Here, given her acute complaints and past history, the diagnosis of probable latex allergy, and the warning about anaphylaxis, plaintiff was required by limitations law to obtain further medical advice. Had she done so, she would have either found out about the type-I injury alleged in her complaint or been able to show that even with due diligence, discovery would not have occurred. According to the evidence, the latter alternative is improbable.[16]

"A person claiming the discovery rule exception has the burden of establishing that he pursued the cause of his injury with those qualities of attention, knowledge, intelligence and judgment which so-

**14.** In her deposition testimony, plaintiff admitted having learned in nursing school that anaphylaxis was a systemic allergic reaction, and that hives, inflammation and swelling were indications of a such an injury. 1/13/00 Hughes dep. at 54–56.

**15.** Plaintiff's contention that the limitations period was tolled until she had an anaphylactic reaction and, subsequently, received final diagnosis of type-I allergenicity in May, 1995, is inconsistent with Pennsylvania law. "So long as the claimant is aware that he [or she] has an injury there is no requirement that he [or she] be aware of a precise diagnosis[.]"

*Ackler v. Raymark Indus., Inc.*, 380 Pa.Super. 183, 194 n. 3, 551 A.2d 291, 296 n. 3 (1988); *see also Souders v. Atlantic Richfield Co.*, 746 F.Supp. 570, 575 (E.D.Pa.1990) ("an asbestosis diagnosis, tentative or final, is not necessary to begin the running of the limitations period").

**16.** Although her treating physician, Levin, persisted in his diagnosis of eczema, it is hard to believe that after July, 1992, an allergist or dermatologist would not have diagnosed type-I allergenicity. *E.g.*, Vonderheid, note 7, *supra*.

ciety requires of its members for the protection of their own interests and the interests of others." *Cochran v. GAF Corp.*, 542 Pa. 210, 219, 666 A.2d 245, 250 (1995) (quotations omitted). Here, plaintiff waited three years after Vonderheid's preliminary diagnosis to obtain additional information about her allergenicity and almost two years more to file suit. *See, e.g., Pitts v. Northern Telecom, Inc.*, 24 F.Supp.2d 437, 442 (E.D.Pa.1998) (computer keyboard user knew or should have known of her keyboard use injury before diagnosis of carpal tunnel syndrome and more than two years prior to filing suit). "[W]here the undisputed facts lead unerringly to the conclusion that the time it took [plaintiff] to discover an injury or its cause was unreasonable as a matter of law, summary judgment" may be appropriate. *Borough of Mifflinburg v. Heim*, 705 A.2d 456, 467 (Pa.Super.1997) (citation omitted). Because no genuine triable issue exists on this point, plaintiff's tort-based claims must be dismissed.

### B. Breach of Warranty

■ The warranty claims based on gloves delivered before February 13, 1993 are subject to the four-year statute of limitations, 13 Pa.C.S.A. § 2725.[17]

For the dismissal of warranty claims that arose after February 13, 1993, defendants rely on *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, 833 F.2d 491, 496 (3d Cir.1987) ("damages sought must be a proximate consequence of the breach, not merely remote or possible.... The element of causation defines the range of socially and economically desirable recovery and requires not only 'but-for' causation in fact but also that the conduct be a substantial factor in bringing about the harm.").[18] While plaintiff concedes her prior allergenicity,[19] it cannot be said as a matter of law that gloves delivered on or after February 13, 1993 could not have caused her subsequent complaints.[20] Ac-

---

17. Section 2725:

(a) General rule.—An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(b) Accrual of cause of action.—A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

13 Pa.C.S.A. § 2725. Because plaintiff has not produced evidence of an express warranty, that claim must be dismissed, 13 Pa.C.S.A. § 2313.

18. At issue in *Nat'l Controls Corp. v. Nat'l Semiconductor Corp.*, was whether a buyer's alleged loss of profits were caused by a sell-

er's breach of contract and warranty. 833 F.2d at 496.

19. Plaintiff does not challenge defendant's argument insofar as it relates to Vonderheid's evaluation of her:

Ultimately ... the same analysis applies to all Counts of Plaintiff's Complaint. That is, if the Court determines that Plaintiff learned of her Type I latex allergy in May 1995, then Defendants' motion for summary judgment must be denied. Conversely, if the Court finds that Plaintiff understood by July 29, 1992 that latex gloves caused her to suffer from a type I latex allergy, then Defendants' motion for summary judgment should be granted. Therefore, no good purpose is served in rebutting each of Defendants' additional arguments concerning Counts III–V of Plaintiff's Amended Complaint.

Pltf. mem. at 23.

20. It is doubtful that the assumption of risk defense applies to plaintiff's warranty claims. *See Petrokehagias v. Sky Climber, Inc.*, Nos.

cordingly, the breach of warranty claims for gloves within the four-year limitations period will be permitted to survive summary judgment.

An appropriate order follows.

## ORDER

AND NOW, this 12th day of April, 2001, the motion of defendants. Allegiance Healthcare Corporation/Baxter Healthcare Corporation, Johnson & Johnson Medical, a division of Ethicon, Inc., and Becton, Dickinson and Company for summary judgment is ruled on as follows:

Count I (Negligence)-granted.

Count II(Strict liability)-granted.

Count III(Breach of warranty)_denied as to claims based on delivery of latex products on or after February 13, 1993; granted as to claims based on deliveries before that date; granted as to breach of espress warranty.

Count IV(Fraudulent concealment)-granted.

---

Civ.A. 96–CV–6965, Civ.A. 97–CV–3889, 1998 WL 227236, at *5 (E.D.Pa. May 4, 1998) (assumption of risk "is not recognized in Pennsylvania as a defense to warranty actions"); *but see Phillips v. Allen*, 427 F.Supp. 876, 879 (W.D.Pa.1977) ("in a suit brought under the Uniform Commercial Code[,] Pennsylvania would hold that assumption of a known and unreasonable risk is a defense to an action for breach of implied warranty."); *cf. Howell v. Clyde*, 533 Pa. 151, 162 & n. 10, 620 A.2d 1107, 1112–13 & n. 10 (1993) (in negligence action, assumption of risk to be applied by the court in determining duty, and not as an affirmative defense to be submitted to the jury, except "in cases involving express assumption of risk, or cases brought pursuant to 402A (strict liability theory), or cases in which assumption of risk is specifically preserved by statute"). Nevertheless, even if the defense were to apply, given that plaintiff denies subjective awareness of her systemic injury prior to 1994, when she stopped using latex gloves, summary judgment will not be granted on that basis. *See, e.g., Staymates v. ITT Holub Industries, Div. of Int'l Tel. & Tel. Corp.*, 364 Pa.Super. 37, 49, 527 A.2d 140, 146 (1987) (the "court may itself determine the issue only where reasonable men could not differ as to the conclusion").