VINCENT AXFORD

*v.*

PHIL PRICE, *et al.*

(No. 10272)

Submitted September 26, 1950. Decided October 17, 1950.

*A. Maurice Foose,* for appellants.

*Okey P. Keadle,* for appellee.

RILEY, JUDGE:

Vincent Axford filed his bill of complaint in the Circuit Court of Cabell County against C. S. Price and Phil Price, husband and wife, respectively, praying that an injunc-

tion issue restraining the defendants from further violating a certain provision of the contract between the parties for the sale of the "Famous Market", located at 418 Third Avenue in the City of Huntington, whereby the defendants agreed not at any time to enter into competition with the plaintiff in the same business and in the same territory, in which the plaintiff operates, or will operate, in the continuance of the business of the Famous Market. Further the bill of complaint prays that damages resulting from the alleged violation of the contract of sale by ascertained, and a decretal judgment be entered therefor.

The trial chancellor, after considering the pleadings and the evidence, found that the defendants had breached their contract, and on the basis of this finding enjoined and restrained the defendants from "selling meats at wholesale to jobbers or retailers doing business in the trade area of the City of Huntington;" and entered a decretal judgment in favor of plaintiff for damages in the amount of eight thousand dollars. The decree, after reciting that it further appearing to the court that plaintiff has discontinued his business in view of defendants' alleged violations, ordered "that if the plaintiff shall not reenter upon and engage in the wholesale meat business within the period of sixty days" from the date of the entry of the decree, the defendants may apply for a vacation of such injunction. From this decree the defendants prosecute their appeal and supersedeas.

The contract under appraisement bears date November 16, 1943, and is signed by the defendants, C. S. and Phil Price. It provides that in consideration of the sum of fifteen thousand dollars, cash in hand paid, the Prices did "sell, assign, grant and set over unto the said Vincent Axford" certain listed personal property, including trucks, scales, office equipment and "the trade mark 'Famous Market', being the majority or major portion of the personal property used by the Vendor [the defendants] in and about the business of wholesale meats and produce conducted under the trade name of Famous

Market, and located at No. 418 Third Avenue: With the agreement that the Vendor will not at any time go into competition with the Vendee in the same business in the same territory in which the Vendee [the plaintiff] operates or will operate in the continuation of the business aforesaid of the said Famous Market." By the same contract all saleable merchandise then on hand was to be sold and set over to the plaintiff Axford for a sum to be determined by an inventory. For the foregoing merchandise plaintiff paid the additional sum of seven thousand dollars.

At the time of the sale defendants had four drivers or salesmen, namely, T. C. Thornburg, H. W. Edwards, Tracy Jones and Mack Fowler, who operated eight routes covering portions of West Virginia and Kentucky for the purpose of selling meats for the defendants at wholesale directly from the truck to certain retail outlets. These drivers or salesmen had conducted the trade on the routes, and they continued on with plaintiff in the same capacities after the contract was made as they had been doing with the Prices.

In 1943, as well as in preceding years, the Prices did a gross business of more than five hundred thousand dollars a year. For the years 1944 and 1945, plaintiff did a gross business of four hundred fifty thousand dollars a year. In 1946, due to the operation of the O. P. A. and the consequent scarcity of meats, plaintiff's business decreased materially. Two of the drivers were taken off their routes, and the remaining two worked most of their time at plaintiff's store at 418 Third Avenue. With the discontinuance of the O. P. A. in October, 1947, meat supplies became more plentiful.

During 1946 Mack Fowler left Axford's employment, telling the latter that he had another job. Tracy Jones also left about that time, Thornburg and Edwards stayed on, and Mack Fowler returned in the fall. Dayton Thomas was hired to fill Jones' place. Thomas went into the army, and J. E. Thornburg took over Jones' route. Mack Fowler left plaintiff's employment in January, 1948, and went

into the wholesale meat business for himself, covering the same territory that he had worked for the Prices and later for Axford. T. C. Thornburg talked to Axford about quitting in April, 1948, but agreed to stay on until July 1, 1949, when he also left. Edwards quit the last of June, 1949. The two last-mentioned men also went into the wholesale meat business for themselves, and worked the routes formerly covered by them. At this time Axford ceased to sell meat by trucks. The record rather clearly discloses that the good will having been built up by the respective driver-salesmen, plaintiff was not in a situation to obtain drivers who could compete with his former employees.

The record likewise discloses that at least some of these former drivers, after going into business for themselves, worked the same routes which they had followed during their employment with plaintiff and defendants.

In 1946 plaintiff's business netted him between twelve and thirteen thousand dollars; in 1947, 1948 and 1949 his net business profits were $17,311.00, $14,890.00, and $4,383.00, respectively.

The record discloses, and the defendants admit, that for the years 1941 and 1942 they did a gross yearly business in excess of four hundred thousand dollars. At that time defendants did not cater to wholesalers, although if a wholesaler was short they would furnish the item as an accommodation or courtesy. In the fall of 1947, as heretofore stated, defendants began to sell to jobbers and wholesalers, and the several drivers who had formerly carried on business for the Famous Market, while under the control of both defendants and plaintiff, having gone into business for themselves, began purchasing their meats from the defendants, notwithstanding the contract in evidence.

In February, 1946, defendants erected a cold storage plant in the rear of their residence, designed especially for the handling of frozen foods. The plan of handling such foods was later given up, and in the fall of 1947 de-

fendants began to sell some sausage, smoked meats, and like merchandise, but by 1949 they had virtually entered into the business of selling meats at wholesale to retail dealers.

Defendants' volume of gross business for 1949 was $374,-000.00. C. S. Price testified that the profit was ordinarily between three and four per cent. On the basis of three and one-half per cent of the gross business, the Prices' net profit in 1949 was $13,090.00. In view of this evidence the trial court set plaintiff's damages at eight thousand, or four thousand dollars for each of the years 1948 and 1949.

On this record two questions are raised by defendants: (1) Were the defendants at the time of the bringing of this suit virtually engaged in a business which they had by their contract agreed not to enter; and (2) the quantum of damages.

Although the validity of the contract was not challenged in the lower court or in this Court, it seems to be the duty of this Court to consider the restrictive convenant in the contract before dealing with the specific questions assigned as error in the record.

It is to be noted that the instant contract is unlimited, both as to time and place. As to time the contract reads that the Prices will not *"at any time* go in competition" with plaintiff; and as to place the contract reads "in the same business in the same territory in which the Vendee [the plaintiff] operates or will operate in the continuation in the business aforesaid of the said Famous Market". Thus it may be seen that the defendants contracted not to compete with the plaintiff at any time or at any place in the continuation of the said business.

Before the middle of the nineteenth century in England the mere fact that a convenant was unlimited in time or space did not make it unreasonable, and therefore unlawful. 5 Williston and Thompson, Williston on Contracts, Rev. Ed., Sections 1638 and 1639. In Section 1639 of the

last-mentioned authority it is stated: "The old view that any restraint of trade covering the entire state or nation is invalid has almost disappeared, at least where the restraint is limited in time. Where there is no express limitation in space, the courts will endeavor to interpret the contract as providing for a reasonable limitation in view of the attendant circumstances." This Court has followed the modern rule in the case of *Boggs* v. *Friend,* 77 W. Va. 531, 87 S. E. 873, in which the Court had under appraisement a contract between a seller and purchaser of an established business which bound the seller, as incidental to the sale and purchase of the property, not to "engage in the blacksmith business in the vicinity or neighborhood where said blacksmith shop was located, or at any other place so near thereto as to constitute a rival business or detract from the patronage which would naturally or likely go to the shop and business so purchased by plaintiff from him." The second point of the syllabus in the *Boggs* case, in which this Court has committed itself to the modern rule of the interpretation of restrictive covenants reads: "In such cases the test in determining the validity or invalidity of the contract is the reasonableness of the restraint imposed, and it will be enforced as to time and space only to the extent necessary to protect the rights of the parties and the interest of the public therein, if any." So we are of opinion that the instant contract is valid and should be interpreted from time to time so as to prevent the defendants from going into competition with plaintiff, but such restrictive covenant, though it is expressly unlimited as to both time and place, should be applied to the extent, but only to the extent, that may be reasonable for the protection of the plaintiff in the business of the Famous Market.

The evidence in this case is clear that the Prices for a number of years prior to the sale of the business of Famous Market to the plaintiff were engaged in the general wholesale meat business. During that period the meat business was conducted to a large extent by sales from trucks owned by the defendants and driven by defendants' then employees over certain defined routes,

which extended outside the City of Huntington into Raleigh County, along the Kanawha River in Kanawha County, and into the Logan and Williamson coal fields, and Kentucky in the Big Sandy area. After the instant contract was executed, plaintiff Axford, using the trucks which defendants had sold him under the contract, with defendants' former employees as drivers entered into the wholesale meat business under the trade name of Famous. Market over the same routes that the Prices had formerly served the retail meat business. During this period of time, as well as during the time the defendants operated the business, meats were sold from the trucks to retail meat dealers along the various routes, but only on a small scale to wholesalers and truck drivers employed by other wholesale meat dealers, as a courtesy when those wholesale meat dealers and their drivers ran out of meat along the routes.

In 1947 this record discloses that the defendants again entered into the wholesale meat business, though instead of using truck drivers along defendants' routes, as they formerly had done prior to the sale to plaintiff, they sold meats to truck drivers, who owned their own trucks and who came to their place of business for the purpose of obtaining meats to sell along certain routes. We have already portrayed the circumstances in which plaintiff's truck drivers, who were defendants' former employees, left plaintiff's employment, and proceeded with their own trucks along the same routes on which they had formerly, as employees of plaintiff and defendants, sold meats. But this record discloses that these former employees, as well as other independent truck drivers using the routes formerly served by plaintiff and defendants bought most of their meats from the defendants. So after 1947 the plaintiff and defendants were both engaged in the wholesale meat business in competition with each other.

We see no merit in defendants' position that the business conducted by them is not the same business, and therefore is not in competition with plaintiff's business.

From the time that defendants again entered into the wholesale meat business in 1947 until 1949, and at the time this suit was pending, the defendants' business grew apace. In 1949 the defendants sold meats to independent truck drivers, including their and plaintiff's former employees. These former employees of the defendents and plaintiff having built up a good will of their own during their former employment along the routes which they formerly served as employees of plaintiff and defendants, the plaintiff was not in a position, as his testimony indicates, to employ other truck drivers to act in competition with them. In 1949 the defendants' gross business was in the amount of $374,000.00, which the defendant, C. S. Price, testified would yield a net profit of between three and four per cent. On the basis of three and one-half per cent of the gross business of the Prices, the total profit for 1949 was $13,090.00. On the other hand, plaintiff's business so decreased, we think because of the defendants' competition with him, that his net profits decreased from $17,311.00 in 1947 to $4,383.00 in 1949. And, finally, plaintiff, through no fault of his own, but through defendants' unlawful violation of their contract, was substantially forced out of the wholesale meat business. Clearly, defendants should not be heard to say that the case is moot. In fact, the circuit court properly appraising this situation in the injunction provided that it may be dissolved if the plaintiff within sixty days does not return to the wholesale meat business.

The contract in question being valid, and, in our opinion, clearly breached, the trial court, in our opinion, did not err in granting the injunction, but because the injunction has no limitation as to time, we think it should be modified to read "until the further order of the Circuit Court of Cabell County."

The measure of damages presents a difficult question, but we think the award of damages in the amount of eight thousand dollars, being four thousand dollars for the year 1948 and four thousand dollars for 1949, was amply justified by the evidence in this case. In ascertaining the

amount of damages the trial court took into consideration both plaintiff's loss of profit during the years 1948 and 1949 and defendants' profit during the year 1949. As stated in the note at page 1156 in the case of *Merager* v. *Turnbull* (Wash.), 99 P. 2d 434, 127 A. L. R. 1142: "The problem of ascertaining damages for breach of a contract not to engage in business in competition with another has given the courts considerable difficulty, inasmuch as from the nature of the case it is seldom possible to establish with complete accuracy the damages caused to plaintiff. The courts appear to differ somewhat, in respect to strictness, in their requisites as to proof of such damages." In the *Merager* case the Court held that the measure of damages recoverable for the breach of a covenant of the seller of a business not to reengage in the business in competition with the purchaser is the value of the business lost by plaintiff and not the gain of defendant resulting from his breach of the covenant. This seems to us to be a sound rule because a defendant may upon reengaging in business by reason of his superior skill and experience make a profit greater than the loss suffered by plaintiff. See 25 C. J. S., Damages, Section 90, page 633, to the effect that "the rule has been announced that, where an established business has been interrupted, the measure of damages is the loss of profits, together with such expenses as continue while the business is interrupted." In 1948 after defendants had reengaged in the wholesale meat business, plaintiff's profits during the preceding year had decreased by $2,421.00, and in 1949 plaintiff's profits fell to $4,383.00, or a loss from 1947, when defendant reengaged in business, of $12,928.00, making a total of $15,349.00. The trial court considered this loss of profit of $15,349.00, together with the fact that defendants, the Prices, were long experienced in the wholesale meat business, and plaintiff at the time he purchased the business was without any experience whatever in regard thereto, and instead of awarding damages in the amount of $15,349.00, the court, evidently in an earnest effort not to do injustice to the defendants, assessed plaintiff's damages at the arbitrarily low figure of eight thousand dollars. We think

the court was justified in making this award of damages, and if the amount is too low, plaintiff does not complain.

The decree of the Circuit Court of Cabell County is modified to read "until the further order of the Circuit Court of Cabell County"; and, as modified, the decree is affirmed. The plaintiff, having substantially prevailed, is awarded costs in this Court and in the circuit court.

*Decree modified; and, as modified, affirmed.*