983 F.2d 1055
 22 UCC Rep.Serv.2d 166
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
ABEX CORPORATION/JETWAY DIVISION, A Delaware Corporation,
Plaintiff-Appellant,
v.
CONTROLLED SYSTEMS, INCORPORATED, a West Virginia
Corporation, Defendant-Appellee.
ABEX CORPORATION/JETWAY DIVISION, A Delaware Corporation,
Plaintiff-Appellee,
v.
CONTROLLED SYSTEMS, INCORPORATED, a West Virginia
Corporation, Defendant-Appellant.
ABEX CORPORATION/JETWAY DIVISION, A Delaware Corporation,
Plaintiff-Appellant,
v.
CONTROLLED SYSTEMS, INCORPORATED, a West Virginia
Corporation, Defendant-Appellee.
 Nos. 92-1368, 92-1423, 92-1550.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 26, 1992
Decided: January 12, 1993
 
 Appeals from the United States District Court for the Northern District of West Virginia, at Clarksburg. William M. Kidd, Senior District Judge. (CA-86-202-C-K)
 ARGUED: Joseph W. Dorn, Kilpatrick & Cody, Washington, D.C., for Appellant.
 Randall M. Starrett, II, Bromley, Greene & Walsh, Washington, D.C., for Appellee.
 ON BRIEF: Walter E. Spiegel, Kilpatrick & Cody, Washington, D.C., for Appellant.
 James F. Bromley, William F. Fawcett, Jr., Bromley, Greene & Walsh, Washington, D.C.; Larry J. Austin, Alexandria, Virginia, for Appellee.
 N.D.W.Va.
 Affirmed in part, reversed in part, vacated in part, and remanded.
 Before NIEMEYER and HAMILTON, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 PER CURIAM:
 
 OPINION
 
 1
 Jetway, a division of Abex Corporation (Jetway), appeals the district court's decision, after bench trial, holding that Jetway breached its contract with Controlled Systems, Inc. (CSI). Jetway also appeals the district court's subsequent damage award in favor of CSI, consisting of $6,468,000 in consequential damages, $2,440,000 in compensatory damages, and prejudgment interest on both these amounts. CSI cross-appeals the compensatory damage award, the denial of its claims for fraud and conversion against Jetway, and the district court's subsequent refusal to award punitive damages.
 
 
 2
 Although we affirm the factual findings under the clearly erroneous standard, we conclude that the district court improperly awarded consequential damages to CSI and, therefore, reverse the award of those damages. Additionally, we hold that the district court's compensatory damage award did not accurately reflect CSI's expectation interest and, therefore, vacate and remand this part of the district court's decision. Finally, we affirm the district court's denial of CSI's claims for fraud and conversion, as well as CSI's subsequent request for punitive damages.
 
 
 3
 On remand, the district court should determine the appropriate amount of compensatory damages, including: (a) the amount of profits that CSI would have earned had Jetway used its best efforts to market CSI's ground power units (GPUs), (b) a reasonable royalty on the GPUs which Jetway manufactured and sold from 1986 until the contract expired on June 3, 1988, but (c) less any offsets established by Jetway. The district court should also determine the appropriate amount of prejudgment interest on the revised compensatory damages, because we do not think the district court abused its discretion in originally awarding such interest.
 
 
 4
 * We adopt the factual findings of the district court reflected herein, because they are based on substantial evidence and are not clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564 (1985).
 
 
 5
 * Conduct Prior to the Contract
 
 
 6
 Jetway primarily manufactures aircraft passenger boarding bridges and other related products which are marketed worldwide to commercial airlines and airport authorities. In the latter 1970s Jetway devised the concept of attaching solid state GPUs to these boarding bridges.[1] Jetway also envisioned selling these GPUs to the military. However, Jetway did not have the engineering capability, technology or manufacturing facilities to develop and manufacture a solid state GPU. Nor did Jetway wish to spend the considerable amount of money needed to research, develop and manufacture solid state GPUs in-house. Consequently, Jetway elected to "get out and go find someone that could do it." Joint Appendix (J.A.) at 19.
 
 
 7
 In early 1980, Jetway contacted CSI about the possibility of developing solid state GPUs. CSI agreed to commence design, development and manufacture of prototype GPUs for Jetway. During the development phase, CSI relied on the expertise of its own chief engineer, Mr. Phillips. In addition, CSI utilized its knowledge of existing invertor technology, involving the conversion of direct electrical current into alternating current. Jetway provided no design, engineering or manufacturing ideas to CSI other than the basic performance specifications for the GPUs.
 
 
 8
 In October 1980, CSI shipped the first prototype GPU to Jetway for $39,230. Jetway tested the GPU and advised CSI of performance problems that needed correction. In response, CSI made several modifications to the GPU design. After several tests and resulting modifications, Jetway and CSI resolved most of the problems with the GPU.
 
 
 9
 In March 1981, Jetway ordered an additional eight prototype GPUs to be used for further testing, analysis and refinement. CSI shipped these prototypes between July and October 1981. Jetway paid $220,705 for these prototypes, as well as $25,076 for product development services rendered by CSI from December 1980 to June 1982. Jetway did not intend to use these prototypes commercially, but did use them around the United States and Europe to demonstrate the viability of solid state technology.
 
 
 10
 CSI first attempted to formalize a long-term agreement for the continued development, manufacture and distribution of solid state GPUs by mailing a proposed arrangement to Jetway on September 3, 1981. In response, Jetway drafted a contract detailing the parties' relationship. After CSI added several provisions, the parties finalized their agreement by executing a six-year contract on June 3, 1982 (the Contract). This Contract formed the basis of this litigation between CSI and Jetway.
 
 B
 The Contract
 
 11
 The relevant terms of the Contract required CSI to manufacture solid state GPUs exclusively for Jetway and for Jetway to buy GPUs exclusively from CSI. Paragraph (Par.) 3.0, J.A. at 2060. The Contract also gave Jetway exclusive distribution rights for CSI's GPUs manufactured for military, commercial and private aircraft applications, and gave Jetway the right to use its trademark on CSI's GPUs. Par. 4.0, J.A. at 2060. Most importantly, this paragraph required Jetway to "use its best efforts to promote worldwide sales of GPUs and maintain a sales organization which actively solicit[ed] such sales."
 
 
 12
 Id.
 
 
 13
 Paragraph 14.0 of the Contract allowed Jetway to begin manufacturing its own GPUs "sometime in the future," in which case "Jetway shall reasonably compensate [CSI] for its rights to manufacture in the form of a license royalty or some other consideration negotiated by the parties." J.A. at 2069. Significantly, this paragraph concluded "nothing contained herein shall be construed or interpreted as granting [Jetway] the right to manufacture GPUs at any time, whether GPUs as presently designed or as modified during the term of this agreement, without such reasonable compensation to be agreed by the parties being paid by [Jetway] to [CSI]." Id.
 
 
 14
 The Contract also implemented procedures for Jetway to place purchase orders, and established the prices for various GPUs which Jetway could order. Par. 5.0, J.A. at 2060-62. Specifically, the Contract allowed Jetway to order up to two GPUs per week, but no order became final until CSI gave written acceptance. Pars. 5.1 and 5.2, J.A. at 2060-61. The Contract also allowed CSI to periodically adjust the price of its GPUs in response to fluctuating production costs, but required the parties to negotiate such adjustments in good faith. Par. 5.4, J.A. at 2061.
 
 
 15
 In addition, the Contract established procedures for shipping, storage and payment of GPUs ordered. Pars. 9.0 & 10.0, J.A. at 2064-65. Paragraph 9.5 specified when the risk of loss for the GPUs passed from CSI to Jetway. J.A. at 2065. Notably, paragraph 10.2 also allowed CSI to bill Jetway monthly for labor and material costs "relating to research and development projects directed ... by Jetway." J.A. at 2065. The Contract also contained product warranties by CSI, limited to the repair and replacement of defective parts found within one year of sale. Par. 11.0, J.A. at 2066-67.
 
 
 16
 Finally, the Contract laid the foundation for a future "joint product and development program" for the development, manufacture, marketing and servicing of GPUs. Par. 12.0, J.A. at 2067. The Contract provided no specific terms for this joint-development program, anticipating that the parties would formalize such terms in the future. To facilitate this future joint-development program, the Contract also specified that "during the term of this agreement[the parties] will freely disclose to and exchange with each other all ideas, innovations, designs, technical data, discoveries and other information and material relating to the manufacture, development and marketing of GPUs ... which may be jointly developed by the parties." Par. 13.1, J.A. at 2068.
 
 C
 Conduct After the Contract
 
 17
 Although Jetway claimed that continued performance problems impeded its efforts to sell CSI's GPUs, the parties completed three large GPU purchases totaling 162 GPUs. These purchases included: fifty on July 22, 1982, fifty on March 5, 1984 and sixty-two on September 16, 1985. By December 12, 1985, Jetway had sold all but three of the sixty-two GPUs purchased in September 1985. Jetway also ordered an additional seventy-five GPUs in December 1985 at prices quoted by CSI in a letter dated September 5, 1985. However, the parties never finalized this order, since Jetway refused to accept a five percent price increase demanded by CSI.
 
 
 18
 CSI's GPUs apparently received widespread acclaim from the aviation industry. For example, Mr. Gross, a GPU engineer for a Jetway competitor, acknowledged that CSI's GPUs were "the best in the field." J.A. at 1547. Jetway also told CSI that the GPUs in the field presented "virtually no problems." J.A. at 2437. Finally, on December 12, 1985, Jetway informed CSI that it had received requests for price quotes on "a couple hundred" of CSI's GPUs and that "a number of people will be screaming in the next six months if Jetway doesn't order more units soon." Id.
 
 
 19
 Despite this favorable response, Jetway ceased actively soliciting sales from the military after CSI's GPU allegedly failed a performance test at Tinker Air Force Base (Tinker AFB) in 1984. During this test, the GPU failed to run continuously at its stated capacity. Jetway claimed that this failure precluded sales to the military.
 
 
 20
 However, in a letter dated November 20, 1986 Jetway submitted an unsolicited bid to supply Griffiss Air Force Base (Griffiss AFB) with GPUs. Although Jetway had begun manufacturing its own GPUs by this date, the letter indicated that "over 160 units are in successful operation ...," clearly referring to the 162 GPUs ordered from CSI. In addition, Jetway stated in this letter that its 400 Hz GPU "has been successfully tested on the B1B bomber." J.A. at 2436. Finally, Jetway's own internal memorandum acknowledged that"a Jetpower unit has been on test at Tinker AFB in Oklahoma and has run successfully on all tests except Airborne Radar." J.A. at 2439.
 
 
 21
 During the early course of the Contract, Jetway also began formulating plans to manufacture its own GPUs. Because the Contract required Jetway to pay CSI a reasonable royalty for such manufacture, Jetway attempted to negotiate a licensing agreement with CSI beginning in April 1983. Jetway made several offers for a possible royalty, but the parties could not reach an agreement. Nonetheless, on March 1, 1984, Jetway notified CSI of its intention to manufacture GPUs. Jetway then began preliminary research into new GPU designs, but did not share any of this information with CSI. However, Jetway did not actually begin manufacturing its GPUs until November 1986 in response to winning the contract to supply United Airlines with fifty-two GPUs.
 
 
 22
 Jetway had begun informally discussing this contract with United Airlines sometime in early 1985. However, Jetway did not notify CSI about this potential contract until December 31, 1985. On that date, Jetway forwarded United Airlines' performance specifications to CSI and informed CSI that it believed that CSI's GPUs would not satisfy these specifications. On January 6, 1986, CSI responded that it could not modify its GPUs to meet the performance requirements within the time specified by United Airlines. Jetway then unilaterally modified the CSI GPU in an attempt to meet United Airlines' requirements. Jetway did not share any of these modifications with CSI.
 
 
 23
 In April 1986, this modified GPU, designated Jetpower II, passed United Airlines' qualification test. Jetway then decided to seek the United Airlines' contract with GPUs that it manufactured, believing that CSI's GPUs exhibited too many performance problems and could not meet United Airlines' performance specifications. Because Jetway and CSI had not agreed on a royalty, Jetway instituted this action in the United States District Court for the Northern District of West Virginia on April 16, 1986, primarily seeking a declaration as to the amount of royalties it owed, if any, under the reasonable royalty provision (Par. 14.0) of the Contract.
 
 
 24
 On May 13, 1986, Jetway submitted its bid to supply United Airlines with fifty-two GPUs. On October 7, 1986, United Airlines accepted Jetway's bid. The parties stipulated that between November 1986, when Jetway began manufacturing its GPUs, until the Contract expired on June 3, 1988, Jetway sold $6,100,000 of GPUs which it manufactured primarily to United Airlines.
 
 D
 Proceedings Before the District Court
 
 25
 In its complaint, Jetway sought either an injunction compelling CSI to negotiate a reasonable royalty in good faith, or alternatively, a declaration by the district court of a reasonable royalty, if any, to be paid by Jetway for the right to manufacture GPUs. Jetway also claimed the alleged performance problems of CSI's GPUs breached CSI's implied and express warranties. In response, CSI counterclaimed, alleging fraud, conversion, embezzlement, theft of trade secrets, antitrust violations and breach of contract. CSI requested compensatory, consequential and punitive damages from Jetway.
 
 
 26
 The district court dismissed CSI's trade secret and antitrust claims after Jetway moved for summary judgement. After conducting a nineday bench trial, the district court determined that CSI performed its obligations under the Contract in good faith. Specifically, the district court found that CSI shared its technical information and facilities with Jetway and that Jetway's alleged performance problems with CSI's GPUs did not stem from any product defect attributable to CSI. J.A. at 23.
 
 
 27
 In contrast, the district court found that Jetway did not perform its obligations in good faith. The district court reasoned that Jetway secretly began taking steps to manufacture its own GPUs during a time when CSI continued to share its GPU refinements with Jetway. The district court also found that Jetway failed to market CSI's GPUs to the military despite their widespread acclaim. The district court also noted that Jetway improperly pursued the United Airlines' contract by concealing the test date from CSI, unilaterally modifying CSI's GPU using modifications originally suggested by CSI, and substituting its own GPUs for CSI's to win the United Airlines contract. J.A. at 24. The district court concluded that Jetway egregiously breached its contractual obligations by: (1) developing, manufacturing and selling its GPUs without compensating CSI, (2) failing to use its best efforts to promote sales of CSI's GPUs, (3) failing to continue a joint-development program with CSI and (4) failing to share research and development information with CSI. J.A. at 26.
 
 
 28
 Because the diversity of the parties provided the basis for subject matter jurisdiction, the district court applied West Virginia law to determine the appropriate remedies. As a result of its factual findings, the district court awarded CSI both consequential and compensatory damages. The consequential damage award of $6,468,000 reflected the profits that CSI would have earned until 1986 from its other business lines had the Jetway Contract not consumed all of CSI's resources.[2] The district court predicated the consequential damage award on the basis that, at the time of contracting, Jetway "could have reasonably anticipated" that this Contract would force CSI to forego other business opportunities.
 
 
 29
 The compensatory damage award of $2,440,000 consisted of the entire amount of gross profits Jetway earned from the manufacture and sale of GPUs. The district court computed this award by determining that Jetway earned a forty percent gross profit on its $6,100,000 in GPU sales from 1986 until the Contract expired on June 3, 1988. This damage award supposedly compensated CSI for Jetway's manufacture and sale of GPUs without paying CSI a reasonable royalty.
 
 
 30
 Finally, the district court found that Jetway accomplished its original intent to "manipulate[ ] a small, economically inferior corporation, to research, develop and manufacture a GPU which allowed Jetway to 'get a leg up on the industry.' " J.A. at 24. Nonetheless, the district court found that CSI failed to prove its fraud, conversion or embezzlement claims and, therefore, refused to grant any punitive damages. J.A. at 26. However, the district court did award prejudgment interest on both the consequential and compensatory damage awards.
 
 II
 
 31
 On appeal, Jetway argues that the district court improperly awarded consequential damages. In support, Jetway argues that its Contract with CSI primarily encompassed the sale of goods, thereby invoking the provisions of the West Virginia Uniform Commercial Code (W.V.U.C.C.).[3] Jetway adds that because the W.V.U.C.C. applies to the Contract, CSI could not recover consequential damages.
 
 
 32
 CSI responds by asserting that the Contract encompassed primarily a product development program. CSI contends that the W.V.U.C.C. should not apply to product development contracts, as they primarily encompass the sale of services rather than goods. Lincoln Pulp and Paper v. Dravo, 436 F. Supp. 262 (N.D. Me. 1977); Stone v. Krylon, 141 F. Supp. 785 (E.D. Pa. 1952). In addition, CSI claims that the provisions requiring exchange of information created a joint-venture. CSI asserts that the W.V.U.C.C. should not apply to any contract between joint venturers because the parties are not buyers and sellers to each other.
 
 
 33
 To determine whether the W.V.U.C.C. applies to this Contract, we must focus on its "predominant purpose." Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F.2d 456, 460 (4th Cir. 1983). This inquiry emphasizes three criteria: (1) the language of the Contract, (2) the nature of the business of the supplier and (3) the intrinsic worth of the materials involved. Id. In the present case, we believe that these factors suggest that the Contract primarily contemplated the sale of goods.[4]
 
 
 34
 We base our decision primarily on the fact that the majority of the provisions in the Contract established detailed procedures for buying and selling GPUs. Specifically, the Contract included procedures for making purchase orders and the shipment and storage of goods ordered. The Contract also defined when the risk of loss passed and included CSI's product warranties. In addition, the Contract provided a set price for each GPU ordered and structured Jetway's payments on a unit basis. See, e.g., Advent Systems LTD. v. Unisys, 925 F.2d 670, 676 (3d Cir. 1991) (compensation structure within the contract influences the applicability of the Uniform Commercial Code (U.C.C.)). These provisions weighed in their totality conclusively establish that the Contract primarily contemplated a sale of goods.
 
 
 35
 We disagree with CSI's contention that the Contract primarily contemplated product development or a joint-venture for three reasons.
 
 
 36
 First, the provisions regarding a joint-development program only laid the framework for a possible future joint-venture. The Contract did not provide specific terms for this joint-venture, anticipating only future negotiations. Second, Jetway only paid CSI for product development services rendered before the parties executed the Contract. Third, the intrinsic value of the GPUs far exceeded the value of any development services rendered. For example, even before the parties entered into the Contract Jetway only paid CSI $25,076 for development services as compared with $220,705 for the GPUs. During the Contract, Jetway made no payments for services, but paid approximately $3,500,000 for GPUs. Because the Contract did not formalize any specific terms for the joint-venture and the payments for the development services paled in comparison to the payments for GPUs, we think the product development provisions formed only an ancillary purpose of the Contract.
 
 
 37
 Nor does the fact that the Contract provided for Jetway to make separate monthly payments to CSI for Jetway-directed research and development projects alter our decision. Such a provision at most creates a mixed contract for goods and services. Republic Steel Corp. v. Penn Engineering Corp. 785 F.2d 174, 181 (7th Cir. 1986).
 
 
 38
 In Republic Steel, the contract in question"made specific allocations as to the [products] or services for which remuneration was to be made." Id. at 176. The court held the contract primarily involved a sale of goods, reasoning that "the rendition of the engineering services led directly to the construction of the [goods] which was the heart of the agreement." Id. at 181. Similarly, in the present case the parties intended CSI's research and development expenses to lead directly to construction of GPUs, which was the essence of this Contract.[5]
 
 
 39
 In summary, we find that the Contract between Jetway and CSI primarily contemplated the sale of goods and is, therefore, subject to the provisions of the W.V.U.C.C. The overwhelming majority of jurisdictions recognize that under the U.C.C., an aggrieved seller may not recover consequential damages. Afram Export Corp. v. Metallurgi Halyps, S.A., 772 F.2d 1358, 1368 (7th Cir. 1985); Nobs Chem., U.S.A., Inc. v. Koppers Co., 616 F.2d 212, 216 (5th Cir. 1980); 1 White and Summers at 382.[6] Although we cannot find any West Virginia authority addressing this precise issue, we believe West Virginia would adopt such a conclusion. We, therefore, reverse the district court's award of consequential damages.[7]
 
 III
 
 40
 Jetway and CSI also dispute the proper amount of compensatory damages. The district court computed the compensatory damages of $2,440,000 by determining that Jetway earned a forty percent gross profit on the $6,100,000 in sales of GPUs which Jetway manufactured and sold from 1986 until the Contract expired on June 3, 1988. The district court awarded CSI the entire amount of these gross profits, presumably to compensate CSI for Jetway's failure to pay a reasonable royalty. However, the district court failed to consider damages flowing from Jetway's failure to use its best efforts to market CSI's GPUs or any potential offsets to the compensatory damage award.
 
 
 41
 Jetway argues that this damage award over-compensated CSI for three reasons. First, Jetway contends that awarding the entire amount of its gross profits earned from the manufacture and sale of GPUs constituted disgorgement, an inappropriate contract remedy. Second, Jetway argues that the express terms of the Contract entitled CSI to only a reasonable royalty rather than all of Jetway's gross profits. Third, Jetway argues that the district court failed to consider two offsets to the compensatory damages.
 
 
 42
 In response, CSI argues that Jetway's egregious behavior justifies awarding the entire amount of Jetway's gross profits. CSI reasons that a court may increase contract damages for a wilful breach. CSI also argues that the district court properly ignored Jetway's claimed offsets.
 
 
 43
 In its cross-appeal, however, CSI argues that the compensatory damage award under-compensated its expectation interest. CSI reasons that the reasonable royalty provision contemplated a licensing agreement that would extend beyond the Contract expiration date in 1988. Thus, CSI contends that the district court should have awarded CSI royalties on Jetway's GPU sales beyond 1988.
 
 
 44
 In determining the appropriate amount of compensatory damages under the W.V.U.C.C, we begin with the principle established in W. Va. Code § 46-1-106(1) that "[t]he remedies provided by this Act shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed...." See also, W. Va. Code § 46-2-708(2) ("the measure of damages is the profit ... which the seller would have earned from full performance by the buyer...."). Given the unique nature of contracts, this principle requires a particularized inquiry into the precise terms of each contract to determine what position the aggrieved party would have obtained had the parties performed their contractual duties.
 
 
 45
 In the present case, had Jetway performed its contractual obligations, the terms of the Contract provided two primary sources of revenue for CSI: (1) profits generated under the exclusive distribution provision resulting from Jetway using its best efforts to market CSI's GPUs, and (2) a reasonable royalty earned from Jetway's manufacture and sale of its own GPUs. Accordingly, we think the district court's compensatory damage award failed to adequately measure the profits CSI would have earned had Jetway performed its contractual duties. In fashioning the appropriate compensatory damage award, the district court should have considered: (1) the damages flowing from Jetway's failure to use its best efforts to market CSI's GPUs, including the profits CSI would have earned had Jetway adequately promoted CSI's GPUs, but less the profit from any GPU sales made by CSI to third parties which the exclusivity requirement in the Contract would have precluded absent Jetway's breach, and (2) a reasonable royalty on the GPUs manufactured and sold by Jetway. We shall discuss these two elements of CSI's compensatory damage award separately.
 
 
 46
 * Damages Resulting from Jetway's Failure to Use its Best Efforts to Market the GPUs
 
 
 47
 Determining the amount of damages which adequately compensates CSI for Jetway's failure to use its best efforts to market the GPUs under the exclusive distribution agreement involves a threestep process. The district court must first determine the number of CSI's GPUs which Jetway would have sold had it used its best marketing efforts. AGFA-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518, 1523 (7th Cir. 1989) ("When a distributor obligates himself to use his best efforts to promote a product and then breaks his contract, the remedial question is ... how much he would have sold had he used his best efforts, implying diligent and energetic promotion."). Although this inquiry necessarily requires some degree of speculation, this does not by itself preclude recovery. Bloor v. Falstaff Brewing Corp., 601 F.2d 609, 615 (2d Cir. 1979) ("There is no need to rehearse the many decisions that, in a situation like this, certainty is not required; '[t]he plaintiff need only show a stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached.' ").
 
 
 48
 Notably, the burden for establishing the potential sales rests with CSI.[8] At oral argument, CSI claimed that Jetway's best marketing efforts would have produced additional sales of 252 GPUs. CSI apparently computed this figure by adding the requests for price quotes on "a couple hundred" of CSI's GPUs which Jetway had received by December 12, 1985 (supra at 9), and the fifty-two GPUs which United Airlines ordered from Jetway. We believe CSI's approach does not fairly reflect potential sales for two reasons. First, mere requests for price quotes, while helpful, do not by themselves provide the "stable foundation for a reasonable estimate" of sales which Jetway would have made using its best marketing efforts. Bloor, 601 F.2d at 615. Second, CSI seeks a reasonable royalty on the fifty-two GPUs sold to United Airlines. Infra, Part III B. It cannot, therefore, also recover potential profits on these fifty-two units.
 
 
 49
 To determine the appropriate number of potential sales, the district court may consider, in addition to price quotes, the sales of comparable products by competitors, Bloor v. Falstaff Brewing Corp., 454 F. Supp. 258, 277-81 (S.D.N.Y. 1978), aff'd, 601 F.2d 609 (2d Cir. 1979), and sales projections calculated by the breaching distributor, Perma Research & Development Co. v. Singer Co., 402 F. Supp. 881, 900-02 (S.D.N.Y. 1975), if proof of such factors is presented. The district court may also find it helpful to consider whether Jetway's failure to share its GPU research and modifications affected the potential sales of CSI's GPUs. Had Jetway shared such information, the improved quality of the resulting GPUs might have attracted more buyers.[9]
 
 
 50
 Once the district court calculates the potential sales, it must then determine the net profit that CSI would have earned on each potential GPU sale. This element should present no difficulty, since CSI can establish this figure by showing its profit on previous sales of GPUs. If the district court finds that CSI incurred a net loss on each GPU, as Jetway contends, then CSI will have no recovery under this part of the damages. However, any net losses under this damage analysis should not offset the reasonable royalty due CSI, discussed infra.
 
 
 51
 If the district court determines that CSI should recover any damages for Jetway's failure to adequately market CSI's GPUs, the district court must then consider whether profits generated from certain GPU sales which CSI made from 1986 to 1988 should offset this recovery. Jetway alleges that during this time, CSI made $1,011,152 in GPU sales that "could not have been made ... had the parties been operating under paragraph 4 of the Agreement." Brief of Appellant at 48. By this allegation, Jetway presumably means that had it not breached the Contract, the exclusivity requirement in paragraph 4.0 would have precluded CSI from making any sales to other parties.
 
 
 52
 However, the Contract only prevented CSI from selling GPUs to third parties for aircraft applications. Thus, Jetway must establish that CSI sold these GPUs for aircraft applications before obtaining this offset. In addition, the offset should consist of CSI's net profits, if any, from these sales rather than gross sale proceeds.
 
 
 53
 Jetway also contends that the district court should offset CSI's recovery by the $1,334,000 in sales that CSI would have earned had it not improperly rejected Jetway's December 1985 purchase order for seventy-five GPUs. We disagree. The Contract allowed CSI to request periodic price increases and indicated that no order became final until CSI gave written acceptance. Thus, we do not think CSI wrongfully rejected Jetway's purchase order.
 
 B
 CSI's Reasonable Royalty
 
 54
 Jetway claims that the district court improperly awarded CSI the entire amount of Jetway's gross profits earned from the manufacture and sale of GPUs from 1986 to 1988.[10] Instead, Jetway contends that the appropriate remedy should have included only a reasonable royalty on these sales. We agree. Paragraph 14.0 of the Contract required Jetway to "reasonably compensate [CSI] for its rights to manufacture in the form of a license royalty or some other consideration...." J.A. at 2069. Thus, the Contract only entitled CSI to a reasonable royalty on the GPUs which Jetway manufactured and sold.
 
 
 55
 CSI attempts to justify the amount of the award by suggesting that Jetway's egregious breach permits a court to increase the damage award. We disagree with this argument for two reasons. First, we think that disgorging all the profits earned by Jetway was an inappropriate contract remedy under West Virginia law. Axford v. Price, 61 S.E.2d 637, 642 (W. Va. 1950) ("The measure of damages recoverable for the breach ... is the value of the business lost and not the gain of defendant resulting from his breach.").[11] Second, we believe that, under West Virginia law, evidence of bad faith should not affect the amount of contract damages. Horn v. Bowen, 67 S.E.2d 737, 739 (W. Va. 1951) ("damages in contract cases cannot be punitive ... the plaintiff is not entitled to damages beyond his actual loss."); Hurxthal v. St. Lawrence Boom & Lumber Co., 44 S.E. 520 (W. Va. 1903).[12] Our conclusion stems from the requirement under W.V.U.C.C. § 46-1-106 that damages should place the aggrieved party where it would be absent any breach. Increasing damages for bad faith puts the innocent party in a better position. If the bad faith reaches the extreme, the aggrieved party may seek punitive damages for an independent claim in tort. See infra, Part V.
 
 
 56
 On remand, the district court must determine the appropriate reasonable royalty. In making this determination, we think the district court should only award royalties on the GPUs which Jetway manufactured and sold until the Contract expired on June 3, 1988. We, therefore, reject CSI's claim that its royalty should include sales made beyond 1988. We reach this decision because West Virginia law requires a plaintiff to prove lost profits with reasonable certainty rather than with estimates amounting to speculation and conjecture. Addair v. Motor Ins. Corp., 207 S.E.2d 163, 168 (W. Va. 1974). We think that any attempt to ascertain the probable duration of a licensing agreement would be speculative at best.[13]
 
 
 57
 In summary, we remand the compensatory damage award for the district court to determine the appropriate amount of damages. These damages should reflect Jetway's failure to use its best efforts to market CSI's GPUs less any offsets established by Jetway, and a reasonable royalty on the GPUs which Jetway manufactured and sold from 1986 until the Contract expired in 1988.
 
 IV
 
 58
 On appeal, Jetway also challenges the propriety of the prejudgment interest award. Jetway asserts two reasons why CSI should not recover such interest. First, Jetway claims CSI should not recover prejudgment interest from the date Jetway filed suit because the district court cited CSI for unnecessarily prolonging the trial. Second, Jetway argues that prejudgment interest only applies when the damage amount is a sum certain. We must determine whether the district court abused its discretion in awarding such interest. Eastman Kodak Co. v. Westway Motor Freight, Inc., 949 F.2d 317, 321 (10th Cir. 1991).
 
 
 59
 Under West Virginia law, courts award prejudgment interest to "compensate a plaintiff for the loss sustained by not receiving the amount to which he was entitled at the time he was entitled to it." Employer-Teamsters, etc. v. Weatherall Concrete, 468 F. Supp. 1167, 1171 (S.D.W. Va. 1979). Thus, such an award is necessary to place the injured party where it would have been without any breach. E.I. du Pont de Nemours & Co. v. Lyles and Lang Const., 219 F.2d 328 (4th Cir. 1955).
 
 
 60
 We believe that CSI's delay in the trial should not affect the prejudgement interest award. Weimer-Godwin v. Board of Educ. of Upshur County, 369 S.E.2d 726, 731 (W. Va. 1988) (prejudgment interest should be calculated from the date the cause of action accrued). If anything, CSI's delay only prolonged the time for Jetway to pay CSI what it owed. In addition, the amount of CSI's damages are "certain or can be rendered certain by some reasonable calculation." Board of Educ. of McDowell County v. Zando, Martin & Milstead, 390 S.E.2d 796, 809 (W. Va. 1990) (citing, Bischoff v. Francesa, 56 S.E.2d 865, 876 (W. Va. 1949)). The district court need only determine the number of potential GPUs Jetway would have sold had it used its best efforts to market CSI's GPUs less any offsets established, and an appropriate royalty rate on the $6,100,000 in sales of GPUs which Jetway manufactured and sold from 1986 until 1988.
 
 
 61
 Thus, we do not think that the district court abused its discretion in awarding prejudgment interest to CSI. However, on remand the district court should modify the amount of such interest to reflect both the elimination of the consequential damage award and the modified compensatory damage award.
 
 V
 
 62
 At trial, CSI alleged fraud and conversion against Jetway. CSI also claimed that Jetway's behavior warranted punitive damages. The district court rejected these claims and thus refused to award any punitive damages. On cross-appeal, CSI claims that the district court should reconsider these findings.
 
 
 63
 West Virginia law allows punitive damages in a contract action when the defendant's acts create "an independent intentional tort." Berry v. Nationwide Mut. Fire Ins. Co., 381 S.E.2d 367, 374 (W. Va. 1989). West Virginia law recognizes an independent intentional tort in fraud when a party enters a contract "without intention of performance, for the fraudulent purpose of putting the promisor in an advantageous position at the expense of the promisee." Elk Refining Co. v. Daniel, 199 F.2d 479, 481 (4th Cir. 1952). However, the plaintiff must show "willfulness, wantonness, [or] malice" before recovering punitive damages. Harless v. First National Bank in Fairmont, 289 S.E.2d 692 (W. Va. 1982).
 
 
 64
 In the present case, the district court found that"Jetway egregiously breached" the Contract and that Jetway"set out to ... manipulate[ ] a small, economically inferior corporation." J.A. at 24. The district court then concluded that "CSI failed to prove fraud [or] conversion...." J.A. at 26. We conclude that there is no evidence in the record suggesting that these findings were clearly erroneous. Accordingly, we affirm the denial of CSI's claims for fraud and conversion, as well as the district court's subsequent refusal to award punitive damages.
 
 VI
 
 65
 For the reasons stated herein, we reverse the district court's consequential damage award and vacate and remand the compensatory damage award. However, we affirm the district court's denial of CSI's claims for fraud and conversion, and the district court's subsequent refusal to award punitive damages.
 
 
 66
 On remand, the district court should determine the appropriate measure of compensatory damages, including the profits CSI lost from Jetway's failure to adequately promote CSI's GPUs less any offsets established, and a reasonable royalty on the GPUs which Jetway manufactured and sold from 1986 until June 3, 1988. The district court should also determine the appropriate amount of prejudgment interest on this damage award.
 
 
 67
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED
 
 
 
 [1]
 GPUs provide 400 hertz (Hz) of electricity needed to power aircraft during ground service operations by transforming the 60 Hz electrical power supplied by public utility companies. GPUs can be either motor generated (i.e. moving parts) or solid state (i.e. no moving parts). However, prior to 1980, only motor generated GPUs existed
 
 
 [2]
 The district court only gave lost profits until 1986, reasoning that thereafter CSI "was free to resume its power converter business due to Jetway's actions." J.A. at 26 n.7
 
 
 [3]
 W. Va. Code § 46-1-1 et seq
 
 
 [4]
 Notably, the district court's ruling does not clearly state whether the Contract involves a sale of goods. However, the district court concluded that "CSI did not breach any obligation under ... the West Virginia Uniform Commercial Code." J.A. at 25. This statement implicitly recognizes the application of the W.V.U.C.C
 
 
 [5]
 Two other factors also favor applying the W.V.U.C.C. to the Contract. Those factors include: the need for uniformity in commercial transactions, Republic Steel, 785 F.2d at 181, and the fact that courts overwhelmingly favor applying the U.C.C. 1 James J. White & Robert S. Summers, Uniform Commercial Code § 1-1 at 26 (3d ed. 1988)
 
 
 [6]
 Courts rely on two facts in reaching this conclusion. First, the U.C.C. specifically allows an aggrieved buyer to seek consequential damages under § 2-715 (W. Va. Code. § 46-2-715), but does not specifically allow an aggrieved seller to seek such damages. U.C.C. §§ 2-708, 2-710 (W. Va. Code. §§ 46-2-708, 46-2-710). Second, U.C.C.s 1-106(1) (W. Va. Code § 46-1-106(1)) requires that "consequential ... damages may [not] be had except as specifically provided in this Act or by other rule of law."
 
 
 [7]
 Notably, we would reach this same conclusion even without applying the W.V.U.C.C. Under the reliance theory, courts traditionally limit damages to out-of-pocket expenses incurred in preparation of the contract, rather than profits from foregone opportunities. See, e.g., RCM Supply Co. v. Hunter Douglas, Inc., 686 F.2d 1074, 1079 (4th Cir. 1982) ("Damages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those specific expenditures made in reliance upon the defendant's promise."); McKinly Allsopp, Inc. v. Jetborne Int'l., 1990 WL 959(S.D.N.Y) ("the purpose of reliance damages is to return the innocent party to the position it occupied before [entering the contract]."); Linsker v. Savings of America, 710 F. Supp. 598, 601 n.3 (E.D. Pa. 1989) ("Reliance damages include only those amounts actually paid and expenses incurred on the faith of the contract.")
 In addition, courts consistently hold that an aggrieved party cannot recover both reliance and expectation damages. See, e.g., National Control Corp. v. National Semiconductor Corp., 833 F.2d 491, 499 (3d Cir. 1987) ("Recovery for reliance damages is an alternative to recovery for lost profits, not a measure of additional damages."); Galego v. Knudsen, 573 P.2d 313, 318 (Or. 1978), ("One cannot recover both reliance damages and benefit of the contract as remedies for the same breach."); Beefy Trail v. Beefy King Int'l, 267 So. 2d 853 (Fla. App. 1972), ("A nondefaulting party may ... forego ... his expectation interest and instead seek only ... his reliance interest.").
 
 
 [8]
 As a preliminary matter, Jetway argues that the military should not be considered a viable customer for purposes of determining what sales Jetway would have made using its best efforts to market CSI's GPUs. Jetway claims that the failure of CSI's GPU to run continuously at stated capacity during the Tinker AFB test precluded sales to the military. Jetway adds that the evidence relied upon by the district court in finding this claim pretextual only pertained to the commercial market rather than the military market. However, we conclude that Jetway's letter to Griffiss AFB on November 20, 1986 clearly indicates the viability of the military as a potential customer of CSI's GPUs. In addition, Jetway might have avoided other alleged performance problems with CSI's GPUs had Jetway shared its research with CSI as required under the Contract
 
 
 [9]
 We by no means consider this list exclusive, and leave it to the district court to consider other relevant factors which may assist in computing potential sales
 
 
 [10]
 Although the record does not clearly indicate to whom Jetway sold these GPUs, presumably United Airlines comprised the predominant portion of these sales
 
 
 [11]
 See also, Burger King Corp. v. Mason, 710 F.2d 1480, 1494 (11th Cir. 1983) ("An accounting of profits ... does not comport with the compensatory nature of breach of contract damages."), cert. denied, 465 U.S. 1102 (1984). In addition, awarding more than expectation damages prevents an efficient breach. Marcus, Stowell & Beye Govt. Sec., Inc. Jefferson Inv. Corp., 797 F.2d 227, 232 (5th Cir. 1986)
 
 
 [12]
 Other jurisdictions agree with this principle. Fratelli Gardine S.P.A. v. Caribbean Lumber Co., 587 F.2d 204, 209 (5th Cir. 1979) ("The damage for an inadvertent contract breach is the same as the damage for the most egregious and deliberate breach."). Macon-Bibb ETC. v. Tuttle/White Constructors, Inc., 530 F. Supp. 1048, 1054 (M.D. Ga. 1981) ("The motive or state of mind of the defaulting party is irrelevant...."); Monroe v. Bankers Life Cas. Co., 102 S.E.2d 207, 208 (S.C. 1958) ("[T]he motives of the wrongdoer are not to be considered in arriving at the amount of damages.")
 
 
 [13]
 We express no opinion as to the appropriate royalty rate. However, we note that such rate should range between the twenty percent rate suggested 6350 35 9 by CSI and the three percent rate proposed by Jetway